UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,      )
                                           )

              Plaintiff,          )

      v.                               )        No. 03 CR 90
                                         )

FERNANDO DELATORRE, also known as  )       Judge Ruben Castillo
"Fern," Fern-dog," and "Fernwood,"    )
BOLIVAR BENABE, also known as "Jap," )
JUAN JUAREZ, also known as "Ghost,"   )
JULIAN SALAZAR, also known as "Mando," )
"Comrade," "Conrad," Cuz," and "Cuzzo," )
MIGUEL MARTINEZ, also known as "Big   )
Mike" and "Mizzy," MARIANO MORALES,  )
also known as "Mar," ARTURO BARBOSA, )
also known as "Chipmunk," HAROLD     )
CROWDER, also known as "H-Man,"      )
MIGUEL RODRIGUEZ, also known as    )
"Mental" and "Mento," STEVEN PEREZ, also )
known as "Frantic" and "Big Frantic," BRIAN )
HERNANDEZ, LIONEL LECHUGA, ROMEL )
HANDLEY, also known as "Romellie,"     )
CHRISTIAN GUZMAN, also known as     )
"Mousey," AKEEM HORTON, and STEVEN )
SUSINKA,                             )
                                         )

            Defendants.        )

## MEMORANDUM OPINION AND ORDER

The question presently before the Court comes down to "how many defendants is too

many to join in a single criminal trial?"  In the Second Superseding Indictment ("Indictment") in

this case, the government charged sixteen defendants—all allegedly members of the Insane

Deuce Nation Street Gang ("Insane Deuces")—with violating the Racketeer Influenced and

Corrupt Organizations Act ("RICO"), committing various violent crimes in aid of the

racketeering activity, and drug trafficking.  The government estimates that the trial of this

complex criminal case, which is set to begin on February 6, 2008, will last four to five months. After substantial mitigation presentations which have delayed this case, the government recently announced it will not seek the death penalty against any defendant. One defendant, Akeem Horton, has pled guilty (R. 380), and another defendant, Miguel Martinez, remains a fugitive. Of the remaining fourteen defendants, Romel Handley ("Handley") (R. 151, 503), Steven Perez ("Perez") (R. 161), Miguel Rodriguez ("Rodriguez") (R. 342, 500), Juan Juarez ("Juarez") (R. 367, R. 474), Christian Guzman ("Guzman") (R. 348, 511), Steven Susinka ("Susinka") (R. 403),[1] Julian Salazar ("Salazar") (R. 457, 507), Bolivar Benabe ("Benabe") (R. 485, 513), and Arturo Barbosa ("Barbosa") (R. 509) have filed motions to sever the trial and/or statements in support of severance. Benabe also filed a separate motion to sever Counts Fourteen and Fifteen, which charge him with various firearms violations. (R. 347, Benabe Mot. to Sever.) Pursuant to this Court's prior order (R. 125), motions filed by one defendant apply to all the defendants and, accordingly, this Court has considered the motions for severance on behalf of all the defendants. While the government opposes severance, the government has submitted a statement setting out its preferred severance arrangement if this Court grants the motions to sever the trial. (R. 461, Gov't Severance Statement.)

## THE INDICTMENT

### I. Count One: RICO Conspiracy

Count I of the Indictment alleges that each of the fourteen defendants conspired to violate 18 U.S.C. § 1962(c) through a pattern of racketeering activity, in violation of 18 U.S.C. §

---

[1] Although Susinka is currently represented by counsel, he filed his motion for severance and a separate trial *pro se*. (R. 403.) The other defendants filed their motions to sever through counsel.

1962(d). (R. 227, Indictment, Count One, ¶ 9.) Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Section 1962(d) additionally makes it unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section. 18 U.S.C.A. § 1962(d).

The Indictment alleges that the defendants agreed that a member of their conspiracy would commit at least two of the following acts of racketeering: murder, attempted murder, solicitation to commit murder, robbery, witness tampering, and multiple narcotics offenses. (*Id.* ¶¶ 10-11.) Specifically, the Indictment alleges the following acts of racketeering were committed as part of the conspiracy, violation of 18 U.S.C. § 1962(d):

- On or about January 20, 2002, Juarez, Salazar, Martinez, Perez, Hernandez, and others, known and unknown to the Grand Jury, committed and caused to be committed the attempted murder of a Victim A, in which Perez discharged the firearm which permanently disabled and disfigured Victim A. (*Id.* ¶ 13.)

- On or about January 20, 2002, Juarez, Salazar, Martinez, Perez, Hernandez, and others, known and unknown to the Grand Jury, committed and caused to be committed, the attempted murder of a Victim B. Perez discharged the firearm which permanently disabled and disfigured Victim B. (*Id.* ¶ 14.)

- On or about February 12, 2002, Delatorre, Juarez, Salazar, Martinez, Crowder, Susinka, and others, known and unknown to the Grand Jury, committed and caused to be committed, the murder of Robert Perez. Crowder discharged the firearm that killed Perez. (*Id.* ¶ 15.)

- On or about August 11, 2002, Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Guzman, and others, known and unknown to the Grand Jury, committed and caused to be committed, the murder of David Lazcano. Guzman discharged the firearm that killed Lazcano. (*Id.* ¶ 16.)

- On or about September 19, 2002, Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Guzman, Horton, and others, known and unknown to the Grand Jury, committed and caused to be committed, the attempted murder of a Victim C. Guzman discharged the firearm that permanently disabled and disfigured Victim C. (*Id.* ¶ 17.)

- On or about September 28, 2002, Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, and others, known and unknown to the Grand Jury, committed and caused to be committed, the attempted murder of Victim D. Co-conspirator A discharged the firearm that permanently disabled and disfigured Victim D. (*Id.* ¶ 18.)

- On or about October 16, 2002, Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Horton, Co-conspirator B, and others, known and unknown to the Grand Jury, committed and caused to be committed, the murder of David Morales. Co-conspirator B discharged the firearm that killed David Morales. (*Id.* ¶ 19.)

- On or about November 17, 2002, Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Co-conspirator B, and others, known and unknown to the Grand Jury, committed and caused to be committed, the murder of Urbel Valdez. Co-conspirator B discharged the firearm that killed Urbel Valdez. (*Id.* ¶ 20.)

- On or about May 11, 2003, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Perez, and others, known and unknown to the Grand Jury, committed and caused to be committed, the attempted murder of Victim E. Perez discharged the firearm that permanently disabled and disfigured Victim E. (*Id.* ¶ 21.)

- Beginning at least from in or about late 1994, and continuing through at least the date of return of the Indictment, Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Rodriguez, Susinka, Hernandez, Lechuga, Horton, and others, known and unknown to the Grand Jury, conspired to knowingly and intentionally distribute and possess with intent to distribute controlled substances. (*Id.* ¶ 22.)

## II.  Substantive RICO Violations

### A.  Count Two:  Murder of David Lazcano

In Count II, the Indictment alleges that on August 11, 2002, Delatorre and Guzman, and others known and unknown to the Grand Jury, for the purpose of gaining entrance to, and for maintaining and increasing the defendants' position in the Insane Deuces, knowingly and intentionally murdered David Lazcano, in violation of 18 U.S.C. §§ 1959(a)(1) and (2). (R. 227,

4

Indictment, Count Two, ¶¶ 3-4.) Section 1959 describes penalties for violent crimes in aid of

racketeering activity. Specifically, Section 1959(a)(1) and (2) state that:

> Whoever, as consideration for the receipt of, or as consideration for a promise or
> agreement to pay, anything of pecuniary value from an enterprise engaged in
> racketeering activity, or for the purpose of gaining entrance to or maintaining or
> increasing position in an enterprise engaged in racketeering activity, murders,
> kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in
> serious bodily injury upon, or threatens to commit a crime of violence against any
> individual in violation of the laws of any State or the United States, or attempts or
> conspires so to do, shall be punished– (1) for murder, by death or life
> imprisonment, or a fine under this title, or both; and for kidnapping, by
> imprisonment for any term of years or for life, or a fine under this title, or both;
> (2) for maiming, by imprisonment for not more than thirty years or a fine under
> this title, or both.

18 U.S.C. § 1959.

### B.    Count Three: Conspiracy to Murder Victim F

The Indictment next alleges that beginning as early as August 15, 2002, until at least

August 22, 2002, Salazar, and others known and unknown to the Grand Jury, for the purpose of

gaining entrance to, and for maintaining and increasing the defendant's position in the Insane

Deuces, did knowingly and intentionally conspire to murder Victim F, in violation of 18 U.S.C.

§§ 1959(a)(5) and (2). (R. 227, Indictment, Count Three, ¶¶ 2-3.) In addition to the criminal

penalties state above for violations of Section 1959(a)(2), Section 1959(a)(5) states that

attempting or conspiring to commit murder or kidnapping shall be punishable by imprisonment

for not more than ten years or a fine under this title, or both. 18 U.S.C.A. § 1959(a)(5).

### C.    Count Four: Conspiracy to Murder Victim G

In Count Four, the Indictment charges another conspiracy to commit murder. The

government alleges that beginning as early as September 15, 2002, and continuing to at least

November 2002, Juarez, Salazar, Morales, and Barbosa, and others known and unknown to the

Grand Jury, for the purpose of gaining entrance to, and for maintaining and increasing the

defendants' positions in the Insane Deuces, did knowingly and intentionally conspire to murder

Victim G, in violation of 18 U.S.C. §§ 1959(a)(5) and (2). (R. 227, Indictment, Count Four, ¶¶

2-3.)

### D.     Count Five:  Assault with a Dangerous Weapon Upon Victim C

Next, the Indictment alleges that on September 19, 2002, Delatorre, Guzman, and Horton,

and others known and unknown to the Grand Jury, for the purpose of gaining entrance to, and for

maintaining and increasing the defendants' position in the Insane Deuces, did knowingly and

intentionally assault Victim C with a dangerous weapon, in violation of 18 U.S.C. §§ 1959(a)(3)

and (2). (R. 227, Indictment, Count Five, ¶¶ 2-3.) In addition to the penalties listed above for

violations of Section 1959(a)(2), Section 1959(a)(3) states that the punishment for for assault

with a dangerous weapon or assault resulting in serious bodily injury, is imprisonment for not

more than twenty years or a fine under this title, or both. 18 U.S.C.A. § 1959(a)(3).

### E.     Count Six:  Murder of David Morales

In Count Six, the Indictment alleges that on October 16, 2002, Delatorre and Horton, and

others known and unknown to the Grand Jury, including Co-conspirator B, for the purpose of

gaining entrance to, and for maintaining and increasing the defendants' positions in the Insane

Deuces, did knowingly and intentionally murder David Morales, in violation of 18 U.S.C. §§

1959(a)(1) and (2). (R. 227, Indictment, Count Six, ¶¶ 2-3.)

### F.     Count Seven:  Murder of Urbel Valdez

In Count Seven of the Indictment, the government charges that on November 17, 2002,

Delatorre, and others known and unknown to the Grand Jury, including Co-conspirator B, for the purpose of gaining entrance to, and for maintaining and increasing the defendants' position in the Insane Deuces, did knowingly and intentionally murder Urbel Valdez in violation of 18 U.S.C. §§ 1959(a)(1) and (2). (R. 227, Indictment, Count Seven, ¶¶ 2-3.)

###### G. Count Eight: Assault with a Dangerous Weapon upon Victim E

Finally, in the last substantive RICO count, the Indictment charges that on May 11, 2003, Perez, and others known and unknown to the Grand Jury, for the purpose of gaining entrance to, and for maintaining and increasing the defendant's position in the Insane Deuces, did knowingly and intentionally commit assault with a dangerous weapon upon Victim E, in violation of 18 U.S.C. § 1959(a)(3) and (2). (R. 227, Indictment, Count Eight, ¶¶ 2-3.)

### III. Narcotics Offenses

#### A. Count Nine

Count Nine alleges that Delatorre, Benabe, Juarez, Salazar, Martinez, Morales, Barbosa, Rodriguez, Hernandez, Lechuga, Horton, and Susinka violated 21 U.S.C. § 846 by conspiring with each other to distribute and possess with intent to distribute cocaine, crack cocaine, and marijuana, in violation of 18 U.S.C. § 841(a)(1). (R. 227, Indictment, Count Nine ¶¶ 1-2.) The Indictment alleges that as part of the conspiracy, the defendants used profits from the sale of the drugs to pay dues, buy guns, and finance parties for the Insane Deuces, as well as bond gang members out of jail. (*Id.* ¶¶ 3-4.) Furthermore, the Indictment charges that the defendants engaged in violent acts against rival gang members to protect and increase drug sales. (*Id.* ¶ 6.) Specifically, the Indictment identifies the following drug transactions as part of the conspiracy:

- On or about April 15, 2002, Susinka negotiated the sale of, and then sold, approximately

28 grams of powder cocaine to a cooperating individual. (*Id.* ¶ 9.)

- On or about May 31, 2002, Martinez negotiated the sale of, and then sold, approximately 28 grams of powder cocaine to a cooperating individual. (*Id.* ¶ 10.)

- On or about June 10, 2002, Delatorre negotiated the sale of, and then sold, approximately 52 grams of crack cocaine to a cooperating individual. (*Id.* ¶ 11.)

- On or about June 11, 2002, Insane Deuce gang member and co-conspirator John Landeros ("Landeros") negotiated the sale of, and then sold, approximately 28 grams of powder cocaine to a cooperating individual. (*Id.* ¶ 12.)

- On or about June 28, 2002, Martinez negotiated the sale of, and then sold, approximately 28 grams of powder cocaine to a cooperating individual. (*Id.* ¶ 13.)

- On or about August 21, 2002, another gang member, John Landeros, negotiated the sale of, and then sold, approximately 56 grams of crack cocaine to a cooperating individual. (*Id.* ¶ 14.)

- On or about September 18, 2002, Salazar negotiated the sale of, and then sold, approximately 28 grams of powder cocaine to a cooperating individual. (*Id.* ¶ 15.)

- On or about October 9, 2002, Delatorre negotiated the sale of, and then sold, approximately 52 grams of crack cocaine to a cooperating individual. (*Id.* ¶ 16.)

**B.      Counts Ten and Eleven**

Counts Ten and Eleven of the Indictment charge Martinez, who remains a fugitive, with knowingly and intentionally distributing mixtures containing cocaine, in violation of 21 U.S.C. § 841(a)(1).  Because Martinez remains a fugitive, these Counts will not be at issue during the trial of the fourteen other defendants.

**C.      Count Twelve**

Count Twelve of the Indictment charges that on or about October 9, 2002, Delatorre intentionally distributed in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine, in violation of 21 U.S.C. § 841(a)(1).  Section 841(a)(1) provides that "it shall be

8

unlawful for any person knowingly or intentionally—(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." 21 U.S.C. § 841(a)(1).

## IV.     Firearms Offenses

### A.     Count Thirteen

The Indictment next accuses Delatorre of knowingly possessing a firearm, a Sturm Ruger, Model P-89, 9mm semi-automatic pistol, with the importer's and manufacturer's serial number removed, obliterated, and altered, which had been transported in interstate commerce, in violation of 18 U.S.C. § 922(k). (R. 227, Count Thirteen.) Section 922(k) makes it unlawful "for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce." 18 U.S.C.A. § 922(k).

### B.     Count Fourteen

Count Fourteen charges that Benabe, having previously been convicted of a crime punishable by a term of imprisonment exceeding one year, knowingly possessed firearms in and affecting interstate commerce, specifically, a Rossi, Model 71, .357 magnum revolver bearing serial number F384238, and a Intratec, Model Tec-22, .22 caliber pistol with an obliterated serial number, in violation of 18 U.S.C. § 922(g)(1). Section 922(g)(1) provides: "It shall be unlawful for any person . . . who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year; to ship or transport in interstate or foreign commerce, or possess

9

in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1).

### C.    Count Fifteen

Finally, the last Count in the Indictment charges that Benabe knowingly possessed a firearm, namely, an Intratec Model Tec-22, .22 caliber pistol, which had the manufacturer's serial number removed, obliterated, and altered, which firearm had been transported in interstate commerce, in violation of 18 U.S.C. § 922(k).

### ANALYSIS

Most of the defendants have either filed motions to sever the trial of this fourteen-defendant case or have submitted statements in support of a particular severance arrangement; some defendants seek an individual trial, while others have moved for severance into two or three trials. All of the defendants seek severance under Federal Rule of Criminal Procedure 14, which provides for severance as relief from prejudicial joinder, and a few defendants allege that the Indictment misjoined the defendants under Federal Rule of Criminal Procedure 8(b). Benabe has also filed a motion alleging that the Indictment improperly joined Counts Fourteen and Fifteen in violation of Federal Rule of Criminal Procedure Rule 8(a).

Due to the "mega" nature of this fourteen-defendant case, this case has generated a huge amount of briefing. This Court has previously issued two memorandum opinions in these proceedings. (*See* R. 241, 6/7/2006 opinion denying in part and granting in part defendants' motions for bill of particulars and pre-authorization discovery; R. 424, 9/4/2007 opinion denying Benabe's motion to suppress property seized from his home.) In addition, we have issued four

written orders ruling on certain motions. (*See* R. 460, 10/3/2007 order granting Morales an evidentiary hearing on motion to suppress post-arrest statement; R. 428, 9/6/2007 order denying without prejudice of Morales's motion to suppress post-arrest statement; R. 417, 8/29/2007 order denying in part of Delatorre's motion to suppress post-arrest statement; R. 415, 8/29/2007 order denying Delatorre's motion in limine to restrict the government to using his proffer statement only as allowed by FRE 410). The severance issue itself has generated over twenty, some very extensive, briefs. (*See* R. 151, R. 161, R. 329, R. 342, R. 347, R. 348, R. 356, R. 357, R. 365, R. 367, R. 403, R. 457, R. 461, R. 474, R. 485, R. 500, R. 503, R. 507, R. 509, R. 511, R. 513.) The Court has addressed each of the severance arguments below.

## I.      Benabe's Motion to Sever Counts Fourteen and Fifteen

Benabe moves to sever Counts Fourteen and Fifteen from the remainder of the case. (R. 347, Benabe Mot. to Sever.) Count Fourteen charges Benabe with possessing a firearm after a felony conviction, and Count Fifteen charges him with possessing a firearm with an obliterated serial number. He is charged alone in those counts. (R. 227, Indictment at 40-41.) Benabe alleges that these charges were misjoined with the rest of the Indictment in violation of Federal Rule of Criminal Procedure 8(a). (R. 347, Benabe Mot. to Sever at 7.) In the alternative, he argues that severance of the two counts is warranted under Rule 14. (*Id.*)

Proper joinder of Counts Fourteen and Fifteen requires that they be "of the same or similar character," "based on the same act or transaction," or "connected with" or "parts of a common scheme or plan" as the remaining Counts in the Indictment. Fed. R. Crim P. 8(a). Although the government does not claim that either of the two firearms referenced in Counts Fourteen and Fifteen were used in furtherance of any other crimes in the Indictment, the

11

government argues that these Counts are part of a "common scheme" because the Indictment details a conspiracy that included a pattern of gun violence and systematic weapons possession. (R. 356, Gov't Resp. at 26.) The government points to Paragraph 12(g) of the Indictment, which states: "The Insane Deuces managed the procurement, transfer, use, concealment, and disposal of firearms and dangerous weapons with the Insane Deuces to protect gang-related territory, personnel, and operations, and to deter, eliminate, and retaliate against competitors and other rival criminal organizations." (R. 227, Indictment ¶ 12(g).) The Indictment also charges firearm violations as overt acts in furtherance of the alleged narcotics conspiracy. (*Id.*, Count Nine, ¶¶ 3-4, 7.) In addition, the government argues that the firearms referenced in Counts Fourteen and Fifteen "were recovered simultaneously with other evidence in his residence showing ongoing membership in the RICO conspiracy." (R. 356, Gov't Resp. at 26.)

As explained above, joinder under Rule 8 is to be construed broadly. *Stillo*, 57 F.3d at 557. The Court looks to the face of the indictment to determine whether the charges were properly joined. *United States v. Hubbard*, 61 F.3d 1261, 1270 (7th Cir. 1995). "The focus is on the underlying acts that constitute criminal offenses. The defendants must be charged with crimes that well up out of the same series of such acts, but they need not be the same crimes." *United States v. Pigee*, 197 F.3d 879, 891 (7th Cir. 1999) (quoting *United States v. Marzano*, 160 F.3d 399, 401 (7th Cir. 1998)). If the charged offenses are of like class or category, although not connected temporally or evidentially, joinder should be proper under Rule 8(a). *United States v. Turner*, 93 F.3d 276, 283 (7th Cir. 1996) (internal citations omitted). Something more than the fact that two crimes were committed in the same residence or vehicle must be shown. *Hubbard*, 61 F.3d at 1271.

In this case, while the Indictment does not charge that the guns which formed the basis of the racketeering counts are the same ones that form the basis of the firearms counts against Benabe, joinder of Counts Fourteen and Fifteen was proper under the broad net of Rule 8(a). The firearms counts against Benabe are, indeed, of like class or category to the remaining charges in the Indictment, which included, as the government argues, charges of continuing firearms violations. In addition, while it is not enough that the firearms were found in the same residence as evidence of Benabe's gang involvement, the firearms are temporally linked to the other charges in the Indictment. The Indictment charges that the alleged conspiracy extended from 1994 to at least the date of return of the Indictment in 2006, and the search of Benabe's residence occurred in September 2005.

Nevertheless, the Court finds that severance of Counts Fourteen and Fifteen are warranted under Rule 14(a) because joinder of those offenses "appears to prejudice" Benabe. Fed. R. Crim. P. 14(a). Because the felon-in-possession count would allow the government to introduce evidence of Benabe's 1987 felony conviction for murder, there is a danger that Benabe will suffer prejudice if these counts are not severed from the conspiracy and murder counts in this case. (R. 347, Benabe Mot. to Sever at 7.) "[E]vidence of a prior conviction has long been the subject of careful scrutiny and use at trial because of the danger that the jury might convict, not based on the evidence, but because it feels the defendant is a 'bad person.'" *United States v. Singh*, 261 F.3d 530, 533-34 (5th Cir. 2001) (internal citations and quotations omitted). In *Singh*, the Fifth Circuit held that the district court abused its discretion by failing to sever the felon-in-possession charge because it allowed the government to introduce highly prejudicial evidence that resulted in an unfair trial on the remaining counts. *Id.*; *see also United States v. Hall*, 370

13

F.3d 1204, 1208 (D.C. Cir. 2004) (additional charges that were joined with the felon-in-possession count, charges for which a prior felony conviction was not an element of the offense, may unduly prejudice the defendant).

Cases in which courts have found that joinder of a felon-in-possession charge was not prejudicial are distinguishable from this case. For example, in *United States v. Quilling*, proof that the defendant was a convicted felon would have been admitted anyway because it was an element of the other offenses with which he was charged. 261 F.3d 707, 714 (7th Cir. 2001); *see also United States v. Dowd*, 451 F.3d 1244, 1249-50 (11th Cir. 2006) (defendant not prejudiced by evidence at trial that he was a convicted felon where the jury would have heard all of the firearms-related evidence even in a severed trial); *United States v. Rock*, 282 F.3d 548, 552 (8th Cir. 2002) (where evidence of the felon-in-possession charge would have been admissible in a separate trial of the witness tampering charge, the defendant does not suffer any additional prejudice if the two crimes are tried together).

While instructions to the jury to consider the defendant's criminal history for the limited purpose of the felon-in-possession count may suffice to minimize the chance of prejudice, *Stokes*, 211 F.3d at 1043, this Court declines to take this risk, especially in light of the fact that the cost to judicial economy will be minimal. Benabe contends, and the government does not dispute, that the trial of those two counts would take only two or three days. (R. 347, Benabe Mot. to Sever at 8.) The Court thus orders a separate trial of Counts Fourteen and Fifteen pursuant to Federal Rule of Criminal Procedure 14(a). This trial will occur after Benabe is tried on the other charges in the Indictment.

14

## II.    Federal Rule of Criminal Procedure 8(b)

Federal Rule of Criminal Procedure 8(b) permits an indictment to join two or more

defendants "if they are alleged to have participated in the same act or transaction, or in the same

series of acts or transactions, constituting an offense or offenses. The defendants may be charged

in one or more counts together or separately. All defendants need not be charged in each count."

Fed. R. Crim. P. 8(b); *see also United States v. Smith*, 223 F.3d 554, 573 (7th Cir. 2000). For

defendants to be charged together, the acts or transactions alleged in the indictment thus must

have occurred "pursuant to a common plan or scheme." *United States v. Lanas*, 324 F.3d 894,

899 (7th Cir. 2003). Rule 8(b) is to be construed "broadly to allow liberal joinder in order to

enhance judicial efficiency." *United States v. Stillo*, 57 F.3d 553, 557 (7th Cir. 1995).

Furthermore, "[i]t is well settled that a conspiracy charge is a proper basis for joinder under Rule

8(b)." *Id.*; *see also United States v. Dounias*, 777 F.2d 346, 348 (7th Cir. 1985) ("Conspiracy

charges, . . . , can provide the bond that links the divergent substantive crimes into a single

transaction for Rule 8(b) purposes.")

Defendant Handley argues that he was misjoined in the Indictment in violation of Rule

8(b) because he is only named in Count One, alleging a RICO conspiracy under 18 U.S.C. §

1962(d). (R. 151, Handley Mot. for Severance at 2.) Specifically, Handley argues that the

Indictment fails to identify the nature or scope of his participation in the alleged racketeering

conspiracy and the substantive crimes, and thus he should not have been joined with the other

defendants. (*Id.* at 3-4.) Handley's name is only mentioned in two paragraphs in the Indictment.

First, Paragraph 8m states: "Romel Handley was a Shorty member of the Insane Deuces and held

the position of 'Second Seat Shorty' in Aurora, Illinois. Handley directed other members of the

enterprise in carrying out unlawful and other activities in furtherance of the conduct of the affairs of the Insane Deuces." (R. 227, Indictment ¶ 8m.) Then, in Paragraph 9, Handley's name is listed along with all of the other defendants as having "knowingly and unlawfully conspire[d]" to violate RICO, "that is, to unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of the Insane Deuces, through a pattern of racketeering activity, as alleged herein through paragraphs 10 and 11 of this count of the indictment." (R. 227, Indictment ¶ 9.)

Because Handley was charged with participating in the RICO conspiracy, he was properly joined in the Indictment. Section 1962(d), the "RICO conspiracy statute," provides that it is unlawful "to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section." 18 U.S.C. § 1962(d). Section 1962(c), the "substantive" RICO provision, criminalizes the participation in the affairs of an enterprise affecting interstate commerce through a pattern of racketeering activity. *United States v. Glecier*, 923 F.2d 496, 500 (7th Cir. 1991). Even though the Indictment does not allege that Handley violated Section 1962(c) or agreed to personally commit or participate in the commission of the predicate crimes, Handley was properly joined in the RICO conspiracy count for his alleged agreement and direction to co-conspirators to commit predicate acts on behalf of the conspiracy. *See United States v. Quintanilla*, 2 F.3d 1469, 1484-85 (7th Cir. 1993) (holding that Section 1962(d)'s target is "the agreement to violate RICO's substantive provisions, not the actual violations themselves.") The Indictment properly alleges conspiracy. It included all of the elements of the offense and sufficiently informed Handley of the nature of the conspiracy charge so that he could defend against it and use the judgment as a bar to any future prosecution for the same offense. *See United States v. Garner*, 837 F.2d 1404, 1412 (7th Cir. 1987); *United States v. Torres*, 191 F.3d 799, 805 (7th

16

Cir. 1999). "Generally, an indictment is sufficient when it sets forth the offense in the words of the statute itself, as long as those words expressly set forth all the elements necessary to constitute the offense intended to be punished." *United States v. Torres*, 191 F.3d 799, 805 (7th Cir. 1999) (internal citations omitted); *United States v. Anderson*, 280 F.3d 1121, 1124 (7th Cir. 2002). The conspiracy charge in the Indictment tracks the words of the statute, 18 U.S.C. § 1962(d), and sets forth in detail the "manner and means of the conspiracy." (*See* R. 227, Indictment ¶¶ 9-12.) Therefore, conspiracy was properly charged, and Handley and the other Defendants were properly joined under Federal Rule of Criminal Procedure 8(b). *See Garner*, 837 F.2d at 1412.

## III.     Federal Rule of Criminal Procedure 14(a)

Even though joinder of the Defendants was appropriate under Rule 8(b), Defendants argue that this Court should sever the trial pursuant to Federal Rule of Civil Procedure 14. *See United States v. Garner*, 837 F.2d 1404, 1412 (7th Cir. 1987) ("Once the Rule 8 requirements are met by the allegations in the indictment, severance thereafter is controlled entirely by Federal Rule of Criminal Procedure 14."); *United States v. Diaz*, 876 F.2d 1344, 1357 (7th Cir. 1989) (same). Rule 14 provides: "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "This Rule must be read against the backdrop of Rule 2, which provides that the Federal Rules of Criminal Procedure 'are intended to provide for the just determination of every criminal proceeding. They shall be construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay.'"

17

*United States v. Andrews*, 754 F.Supp. 1161, 1170 (N.D. Ill. 1990) (quoting Fed. R. Crim. P. 2).

The trial court has broad discretion to grant or deny a motion for severance. "Rule 14 leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." *United States v. Rollins*, 301 F.3d 511, 517-18 (7th Cir. 2002). (internal citations and quotations omitted). Indeed, "Rule 14 does not require severance even if prejudice is shown; rather it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." *United States v. Souffront*, 338 F.3d 809, 828 (7th Cir. 2003) (quoting *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993)); *see also United States v. Garver*, 809 F.2d 1291, 1298 (7th Cir. 1987) (The decision whether to grant or deny a motion for severance is vested in the discretion of the district court.). The Supreme Court has instructed that "a district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

In determining whether a joint trial "appears to prejudice" a defendant under Rule 14, the Court traditionally looks to whether any of the following factors exist: (1) antagonistic defenses conflicting to the point of being irreconcilable and mutually exclusive; (2) massive and complex evidence making it almost impossible for the jury to separate evidence as it relates to each defendant when determining each defendant's innocence or guilt; (3) a co-defendant's statement inculpating the moving defendant; and (4) gross disparity in the weight of the evidence against the defendants. *United States v. Clark*, 989 F.2d 1490, 1499 (7th Cir. 1993). "When many defendants are tried together in a complex case and they have markedly different degrees of culpability, this risk of prejudice is heightened." *Zafiro*, 506 U.S. at 539.

18

While there are different degrees of culpability among the defendants, contrary to their claims, the evidence against the individual defendants is not "widely varying," such that they would be prejudiced by the "spillover" effect from the evidence of allegations that do not apply them. (*See* R. 457, Salazar Statement at 1; R. 161, Perez Mot. to Sever at 2; R. 151, Handley Mot. to Sever at 5; R. 342, Rodriguez Mot. to Sever at 3.) Because each individual defendant is a charged member of the RICO conspiracy case, "[t]he vast majority, if not all, of the evidence admitted in the joint trial would have been admissible had [the defendant] been tried alone." *United States v. Souffront*, 338 F.3d 809, 831 (7th Cir. 2003); *United States v. Sababu*, 891 F.2d 1308, 1331 (7th Cir. 1989).

Defendants also argue that they would be unfairly prejudiced by a joint trial because it could result in antagonistic or inconsistent defenses, or, in essence, "defense counsels attacking other defendants." (R. 342, Rodriguez Mot. to Sever at 2; R. 161, Perez Mot. to Sever at 3.) The Seventh Circuit has held, however, that "[f]inger-pointing among the defendants is not only acceptable but also a benefit of a joint trial, for it helps the jury to assess the role of each defendant." *United States v. Hoover*, 246 F.3d 1054, 1061 (7th Cir. 2001). For inconsistent defenses to justify severance, the defenses must be antagonistic to the point of being irreconcilable and mutually exclusive. *United States v. Goodwin*, 496 F.3d 636, 644 (7th Cir. 2007). Defendants have presented no evidence of this.

Defendants also argue for severance because a co-defendant's statement may inculpate them in violation of *Bruton v. United States*, 391 U.S. 123 (1968). (*See, e.g.*, R. 348, Guzman Mot. to Sever at 4.) *Bruton* holds that "it violates the confrontation clause of the sixth amendment to admit against one defendant a confession accusing a co-defendant, when the

19

declarant will not testify and thus cannot be cross-examined." *Hoover*, 246 F.3d at 1058-59

(citing *Bruton*, 391 U.S. 123). Co-defendants' confessions may be admitted, however, if they are

sufficiently redacted so they do not facially incriminate or obviously refer to other defendants.

*United States v. Hernandez*, 330 F.3d 964, 972-73 (7th Cir. 2003) (citing *Gray v. Maryland*, 523

U.S. 185, 197 (1998); *Richardson v. Marsh*, 481 U.S. 200, 206-07 (1987)). In *Hernandez*, for

example, the Seventh Circuit found that the reference in a defendant's post-arrest interview to the

"Latin Kings" did not implicate the co-defendants because those terms could have referred to

"any number of other" Latin Kings. *Hernandez*, 330 F.3d at 974. Pursuant to this Court's order,

the government has submitted portions of various confessions it seeks to use, with suggested

redactions. (R. 356, Gov't Severance Sur-Reply at 16-20.) The government's redactions appear

to follow the prescription laid out by the Supreme Court and the Seventh Circuit, as reviewed

above. As in *Hernandez*, the government refers to "the Insane Deuces" or to "another gang

member" or to "one of the Shorties," rather than to specific Defendants. (*Id.*) At this point, the

Court is satisfied that there will be no *Bruton* violations in this case, and thus severance is not

warranted on this ground. Nevertheless, this Court retains the authority to review co-defendants'

statements and order additionally redactions as necessary.

## IV.     Motions for Individual Trials

Several defendants have filed motions for individual trials pursuant to Federal Rules of

Criminal Procedure 8 and 14. None of these motions has merit.

### A.     Steven Susinka

Defendant Susinka argues in his *pro se* motion for severance that he should be granted an

individual trial because he withdrew from or abandoned any alleged conspiracy by virtue of

20

being in jail when some acts alleged in the Indictment occurred. (R. 403, Susinka Mot. to Sever at 9-10.) Incarceration by itself, however, is not sufficient to achieve a withdrawal from a conspiracy. *See United States v. Wilson*, 134 F.3d 855, 863 (7th Cir. 1998). In addition to the termination of the defendant's active role in the conspiracy, which an arrest accomplishes, withdrawal requires an affirmative act to defeat or disavow the purpose of the conspiracy, such as a full confession to the authorities; mere inactivity is not sufficient. *United States v. Pandiello*, 184 F.3d 682, 687 (7th Cir. 1999); *United States v. Maloney*, 71 F.3d 645, 654-55 (7th Cir. 1995). Moreover, Susinka was arrested and incarcerated in April 2002. (R. 403, Susinka Mot. to Sever at 9-10.) Whether Susinka withdrew from the conspiracy at that point does not affect this Court's decision with regard to severance because a large portion of the allegations against Susinka involve time periods when he was not incarcerated. The Indictment alleges that the conspiracy extended from "in or about late 1994" and continued to at least the date of return of the indictment in 2006. (R. 227, Second Superceding Indictment ¶ 9.) Accordingly, Susinka is properly joined with the other defendants because he is alleged to have been part of the conspiracy for many years, even outside of his period of incarceration.

Susinka also argues that he would be prejudiced by a joint trial because his exculpatory witness would be subject to impeachment by other defendants in the case. (R. 403, Susinka Mot. to Sever at 23-24.) This is in essence a strategy to obtain a better opportunity for acquittal, which is an insufficient basis for severance. *Warner*, 498 F.3d at 700. Susinka does not deserve a separate trial, however, simply because he wants to shield his witness from potentially damaging questioning. The other defense attorneys' questioning will help the jury do what it is required to do: determine the witness's credibility.

### B.    Steven Perez

Perez argues that he should be tried individually because he claims that he would suffer prejudice from a joint trial under Rule 14. (R. 161, Perez Mot. to Sever at 1.) Perez is alleged to be part of the RICO conspiracy in Count One, specifically committing or causing to be committed the attempted murders of Victims A, B, and E. (R. 227, Indictment, Count One ¶¶ 13, 14, 21.) In addition, Count Eight of the Indictment charges Perez with assault with a dangerous weapon upon Victim E. (*Id.*, Count Eight.) Perez argues that he would be prejudiced from the "spill-over" effect of evidence of the other crimes charged in the Indictment. (R. 161, Perez Mot. to Sever at 3.) As explained above, however, because Perez is a charged member of the RICO conspiracy case, much of the evidence admitted in the joint trial would be admissible against him even if he were tried alone. *Souffront*, 338 F.3d at 831. In addition, Perez is named in a substantial number of the violent acts underlying the RICO conspiracy charge, intertwined and overlapping with his co-defendants, such that Perez would not be substantially prejudiced by a joint trial and judicial economy would be disserved by severance into an individual trial.

### C.    Romel Handley

Defendant Handley also filed a motion to sever himself from his co-defendants. (R. 151, Handley Mot. to Sever.) Handley was charged in Count One with being a member of the RICO conspiracy, but was not alleged to have committed any specific illegal act in furtherance of the conspiracy other than holding the position of "Second Seat Shorty" in the Insane Deuces. (R. 227, Indictment, Count One, ¶ 8m.) As explained above, Handley was properly joined in the Indictment under Rule 8(b). Nevertheless, Handley maintains that he will be prejudiced under Rule 14 because there is a gross disparity in the weight of evidence against him versus the other

22

defendants. (R. 151, Handley Mot. to Sever. at 5.)

While Handley's argument for severance is stronger than his co-defendants, this Court is unwilling to sever the Indictment into individual trials because once the special concerns about fairness of the "mega-trial" are addressed, the well-established belief holds true that "joinder of defendants, to the extent possible, will preserve judicial resources and permit the jury to have as complete a view of the evidence as possible." *Gray*, 173 F. Supp. 2d at 10; *see also Hardin*, 209 F.3d at 664 (explaining economies and benefits of joint trial); *Stokes*, 211 F.3d at 1042 (same); *United States v. Kennedy*, 819 F. Supp. 1510, 1517 (D. Colo. 1993) (limiting severance to groups of defendants so that severance will promote and maintain judicial economy inherent in group trials).

### D.    Christian Guzman

Defendant Guzman also seeks a separate trial in this matter. (R. 348, Guzman Mot. to Sever.) Guzman argues that "there is little or no evidence of his involvement in the overall racketeering conspiracy as charged by the Government." (*Id.* at 3.) The Indictment alleges, however, that Guzman participated in the RICO conspiracy through murdering David Lazcano and attempting to murder Victim C. (R. 227, Indictment, Count One ¶¶ 16-17.) In addition, the Indictment charges Guzman with the additional counts of murder and assault with a dangerous weapon. (*Id.*, Counts Two, Five.) In light of the caselaw cited above, and the allegations in the Indictment tying Guzman closely in with the overall RICO conspiracy, the Court denies Guzman's motion to sever.

### V.    Special Concerns Raised by Prospect of Joint Mega-Trial

While no defendant has demonstrated the need for severance based on misjoinder or the

23

traditional concerns of prejudice, the proposed four to five month long trial, and the likely jury

prejudice that could result, are of vital concern to this Court. In addition, time delays and

procedural complications from this "mega-trial" have been and will continue to be significant.

Trial judges have the inherent authority, and duty, to actively manage criminal trials. *See United

States v. Warner*, Nos. 06-3517 and 06-3528, 2007 WL 3101807, at *4-5 (7th Cir. Oct. 25, 2007)

(Posner, J. and Kanne, J., Williams, J., dissenting). Indeed, it has always been this Court's policy

to proactively manage criminal trials to ensure the maximum fairness to each defendant.

Trials of such extensive scope and duration threaten the most basic goals of the federal

criminal justice system: "simplicity in procedure, fairness in administration and the elimination

of unjustifiable expense and delay." Fed. R. Crim. P. 2. *See Andrews*, 754 F. Supp. at 1170

(reading Rule 14 against the backdrop of Rule 2); *see also United States v. Shea*, 750 F. Supp. 46,

47-50 (D. Mass. 1990) (severing trial because of distinctive problems of "mega-trial" such as

complexity, number of defendants, and length of trial); *United States v. Jones*, Crim. Nos. 91-

570-01 thru 91-570-26, 1992 WL 78784, at *3 (E.D. Pa. Mar. 24, 1992) (same); *United States v.

Williams-Davis*, Crim. No. 91-0559, 1991 WL 319692, at *2 (D. D.C. Dec. 16, 1991) (same).

### A. Jury Prejudice

The analysis of jury prejudice is not limited to potential prejudice by the jurors against the

defendants in an extended fourteen-defendant trial. These mega-trials also involve considerable

prejudice to the jury system and the jurors themselves.

### 1. Prejudice to Jury System

It has been long recognized that the risk of prejudice to the entire criminal justice system

increases incrementally with the number of defendants and the length of the trial. The human

limitations of the jury system are especially tested during a lengthy trial. Our esteemed former

Chief Judge Marvin E. Aspen severed a RICO street gang indictment which bears some striking

similarities to the Indictment before this Court. *Andrews*, 754 F. Supp 1161. In *Andrews*, the

principal nexus between all the defendants was their alleged efforts to promote the criminal

activities of a well-organized street gang. *Id.* at 1172. The *Andrews* indictment charged

hundreds of distinct criminal acts committed by gang members over a twenty-three year period.

The *Andrews* opinion is a masterful and scholarly opinion on the issue of severance and potential

mega-trials. Judge Aspen thoughtfully reviewed all of the relevant existing legal research and

thoroughly pointed out all of the real prejudice that arises when prosecutors seek to join a large

number of defendants in complex multi-count indictments covering wide time spans. This Court

fully adopts the wise reasoning of Judge Aspen; everything he said seventeen years ago is still

true today.

Judge Aspen cautioned in 1990 that long and complex trials placed "in jeopardy the most

important objective of a criminal trial: accurate fact finding." *Andrews*, 754 F. Supp. at 1161.

Almost seventeen years later, three judges on our Court of Appeals recently indicated that this

type of long trial makes it more likely that the jury will not be able to render an intelligent

verdict. *See Warner*, 2007 WL 3101807, at *6 (Posner, J., dissenting). "Jurors become

overwhelmed by the volume of evidence and numbed by its repetitiousness. Their attention

flags; their minds wander; the witnesses . . . get mixed up in the jurors' minds, or forgotten; the

profusion of exhibits . . . makes the documentary record unintelligible. The impressions created

by the closing arguments are likely to wipe out everything that went before." *Id.* at *6-7. This

may lead to the serious risk of juror confusion that would "prevent the jury from making a

reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539.

In the forty-four page Indictment before this Court, the grand jury alleges that the defendants belonged to the Insane Deuce Nation Street Gang, which existed to promote illegal activities in Aurora, Elgin, and Chicago. The alleged illegal activities included the trafficking of illegal controlled substances and dangerous weapons, murder, attempted murder, armed robbery, grand theft, witness tampering, and other acts of violence. (R. 227, Indictment, Count One, ¶ 7.) The Indictment covers a ten-year period going back to late 1994. (*Id.* ¶ 9.) The Indictment specifically charges an overarching RICO conspiracy, five attempted murders, four murders, two conspiracies to commit murder; multiple assaults with dangerous weapons; an overarching drug conspiracy; and multiple individual weapons and drug charges. The government estimates that its case-in-chief will run approximately four to five months; however, this does not include time for the defense case, potentially lengthy jury selection, or jury deliberation. The government intends to call at least 130 witnesses, including numerous law enforcement officers and multiple experts including coroners, ballistic experts, and drug chemist experts. (R. 329, Gov't Resp. to Mot. to Sever at 16-17.) This is more than the hundred or so witnesses the *Warner* dissent found would confuse a jury involving only two defendants.

Although we "presume that the jury capably sorts through the evidence and follows the instructions . . . to give separate consideration to each defendant," *United States v. Hardin*, 209 F.3d 652, 664 (7th Cir. 2000), a trial of this length and magnitude raises significant concerns, as noted in the *Andrews* and *Warner* opinions. "There are potentially limits to the complexity that a jury can handle." *United States v. DeCologero*, 364 F.3d 12, 24 (1st Cir. 2004). Jurors will be asked to keep an open mind during the government's months-long trial presentation, and at the

close of the entire case, they will be asked to sift through the sea of evidence and determine how it relates to the alleged role of each of the fourteen individual defendants. The magnitude of evidence makes it almost impossible for the jury to separate evidence as it relates to each defendant when determining each defendant's innocence or guilt. *Garner*, 837 F.2d at 1413; *see also United States v. Oglesby*, 764 F.2d 1273, 1276 (7th Cir. 1985).

In such a case, "[e]vidence concerning the most guilty defendants might, in the eyes of the jury, implicate less guilty defendants by association. The sheer confusion resulting from trying numerous defendants together may also prejudice defendants." *United States v. Sophie*, 900 F.2d 1064, 1083 (7th Cir. 1990). Although careful and frequent cautionary instructions can reduce or eliminate any prejudice which might otherwise result from a joint trial, "there are some situations that make frequent cautionary instructions a mere formality or a procedural nicety that substitutes a form of fairness for the substance of fairness." *United States v. W.R. Grace*, 439 F. Supp. 2d 1125, 1130-31 (D. Mont. 2006); *see also United States v. Gatto*, 746 F. Supp. 432, 449-50 (D. N.J. 1990) (severing case because multiple conspiracies charged in the indictment may, even with extensive limiting instructions, render the jury unable to compartmentalize the evidence against each defendant for each conspiracy).

If anything has changed over the seventeen years since the *Andrews* opinion, it is that jurors' expectations that trials will be conducted quickly and efficiently have steadily increased each year. Our computer-age society expects everything to be conducted in "real time." Thus, it is this Court's belief that today's jurors have an even harder time making sound decisions after a trial which involves hundreds of hours of trial testimony and thousands of trial exhibits. Simply put, an inordinately long and inefficient trial substantially increases poor jury decisions on

multiple levels. *See Warner*, 2007 WL 3101807, at *6 (Posner, J., dissenting).

### 2.     Prejudice to Jurors

This type of trial also imposes a substantial burden on the citizens who serve on the jury. Because of the length of the trial, this Court will be forced to use a special juror summons which will attempt to prequalify potential jurors who can serve on an extended trial without undue hardship. Nevertheless, the jurors who serve on this case will be asked to make a significant time commitment to the federal criminal justice system.

> These almost endless trials obviously work severe hardships on the jurors selected. They are removed from their normal lives for inordinate stretches of time. They must sit stoically and silently for hours every day, day after day. They must absorb vast quantities of information, try to keep it in order, and evaluate its credibility and probative value. They must also perform the "mental gymnastic" [] of properly considering the various permutations of the many limiting instructions they are given.

*United States v. Gallo*, 668 F. Supp. 736, 754 (E.D. N.Y. 1987); *see also United States v. Baker*, 10 F.3d 1374, 1391 (9th Cir. 1993) ("Jurors have their employment and home life disrupted, often at great financial, physical, and personal expense. They . . . are prohibited from engaging in many ordinary pursuits of their daily lives, such as reading the newspaper.") Furthermore, for the five months of trial, jurors must exercise the utmost restraint: carefully evaluating the evidence, yet not discussing the evidence with anyone—even each other. This inordinate burden strains not only the jurors, but the entire jury system.

### B.     Prejudice from the Sheer Number of Defendants

The sheer number of defendants here—fourteen—has inherent risks of prejudice associated with it, most notably from time delays. After the return of the Indictment, the

28

government initially announced its intent to seek the death penalty for eight of the fourteen defendants. The death penalty authorization process alone effectively delayed this case for one year as this Court was obligated to appoint a second, death penalty attorney for each of the eight affected defendants and allow for appropriate mitigation presentations. In the end, the government declined to proceed with death penalty proceedings. Throughout this entire period, the non-affected six defendants could only prepare for and await trial. During this entire extended time period, all defendants have been incarcerated pursuant to appropriate pretrial detention orders.[2] This is a significant prejudice for defendants who are presumed innocent. In cases such as these, the defendants' "Sixth Amendment rights to a speedy trial are stretched about as far as can be without making a mockery of that constitutional protection." *United States v. Gallo*, 668 F. Supp. 736, 754 (E.D.N.Y. 1987) (severing trial of fourteen defendants).

## C.    Prejudice from the Sheer Length of the Trial

The risk of prejudice is also inherent in lengthy trials. If this trial proceeds with all fourteen defendants, the government estimates that the trial will consume four to five months of trial time. Each defendant will individually participate in each phase of the trial through counsel,[3] which includes jury selection, opening statements, cross-examination of government witnesses, objections, sidebars, motions in limine, closing arguments and jury instruction conference. *See Andrews*, 754 F. Supp. at 1173. The multiplication of each phase of the trial with the proposed fourteen defendants will only lengthen the trial and may result in a trial beyond

---

[2] Defendant Juarez was a fugitive until he was recently arrested in April of 2007.

[3] It is noteworthy that defendant Susinka has filed a pending motion to dismiss his court-appointed counsel and represent himself without the assistance of any counsel. In this Court's experience, this proposed action may unduly extend the trial.

the estimated five months despite the best efforts of this Court. Furthermore, the trial will be

lengthened by the scheduling conflicts, absences, or tardiness that will in evitably occur with the

large number of jurors, alternates, defendants, witnesses, attorneys, and court personnel that must

be present in court each day. *See United States v. Gray*, 173 F. Supp. 2d 1, 9 (D. D.C. 2001)

(granting severance in part because of the enormous task of coordinating the schedules of the

seventeen defendants, their attorneys, the attorneys for the government, the marshals, the trial

judge, the court reporter, the courtroom clerk, and other assorted personnel who must be involved

with the trial on a daily basis).

The sheer length of the trial may result not only in possible prejudice to the defendants

and the jury as detailed above, but, as Judge Aspen so astutely observed in *Andrews*, also to the

defense attorneys, the government, the taxpayers, and this Court. Defense attorneys are drawn

away for an extended period from other clients and matters; the government must commit

experienced prosecutors to a single trial indefinitely; this Court's other pending cases—civil and

criminal—would be unfairly delayed; and the taxpayers would ultimately have to pay for the

extended criminal trial, including the costs of prosecution, court costs, and the public cost of

providing defense counsel to each defendant, including two defense counsel for each defendant

against whom the government considered seeking the death penalty. *See Andrews*, 754 F. Supp.

at 1172-75.

Three federal appellate courts have voiced similar misgivings about trials of this

magnitude. The United States Court of Appeals for the Second Circuit Court has attempted to

address "the evident disadvantages which can occur in these mega-trials," by directing that where

the prosecution's case is likely to require more than four months to present, the prosecutor must

make an especially compelling justification for a joint trial of more than ten defendants. *United States v. Casamento*, 887 F.2d 1141, 1151-52 (2d Cir. 1989). The Second Circuit recognized the need for trial judges to weigh the interests of the prosecution, the defendants, the jurors, the court, and the public. *Id.* at 1152. The Fifth Circuit echoed the concerns that "[e]xceedingly long trials impose substantial burdens on the trial court, attorneys, defendants, support personnel, and particularly on jurors." *United States v. Ellender*, 947 F.2d 748, 754-55 (5th Cir. 1991) (citing *Casamento*, 887 F.2d at 1151-52.) Likewise, the Ninth Circuit detailed the "indisputably staggering hardships" that "fall not only on the defendants, but on defense counsel, prosecutors, the jury, the district court, the court of appeals, and the taxpayers" in lengthy criminal cases. *United States v. Baker*, 10 F.3d 1374, 1390 (9th Cir. 1993).

In fact, contrary to the view that joint trials serve the goals of judicial efficiency and economy,[4] the Ninth Circuit has aptly noted that in such large trials, judicial economy will often be better served by severance because: (1) as the government proceeds through separate trials, its presentation becomes sharper and more streamlined so that later trials move more quickly; (2) with fewer defendants and defense counsel, there will be fewer sidebars and continuances; and (3) the court becomes more familiar with the case and the evidence, allowing more expeditious and efficient rulings. *Baker*, 10 F.3d at 1389-90. Furthermore, the Ninth Circuit opined that "[d]isclosure of the government's method and quality of proof may even benefit the prosecution

---

[4] *See, e.g., United States v. Wilson*, 481 F.3d 475, 482 (7th Cir. 2007) (noting preference that co-conspirators be jointly tried, particularly when they were indicted together); *United States v. Hardin*, 209 F.3d 652, 664 (7th Cir. 2000) (holding that in most conspiracy cases, the economies of a single trial outweigh any danger of prejudice); *United States v. Stokes*, 211 F.3d 1039, 1042 (7th Cir. 2000) (observing that in general, the "joinder of offenses reduces the waste of precious judicial and prosecutorial time in the already overburdened federal judicial system and reduces the burdens on witnesses from testifying at multiple trials").

by inducing additional guilty pleas from severed defendants." *Id.* at 390.

## D.    Procedural Complications

The procedural complications resulting from these types of large-scale indictments also cannot be understated.  For instance, this Court has been unable to conduct one general status hearing for all the defendants throughout the multiple pretrial proceedings in this case.  Instead, the United States Marshal's Office has had to bring the defendants to court in two stages in order to divide the defendants into a safely guardable group.  Our courthouse does not presently have any courtroom large enough to safely and effectively try a group of fourteen defendants.  The resource and staffing requirements of the Marshal's Office to conduct such a large trial over an extended period are considerable and will surely affect many other criminal proceedings in this district.

Moreover, even if we expended the exorbitant costs necessary to accommodate such a large trial, the fairness to the defendants of such a crowded proceeding is questionable.  In evaluating the propriety of a trial of twenty-three defendants, the Fifth Circuit explained that the seating arrangements, while "suitable perhaps for enjoying an afternoon of football," were "of questionable propriety for a protracted trial."  *United States v. Ellender*, 947 F.2d 748, 754-55 (5th Cir. 1991).  The Court described the courtroom scene as follows:

> Each defendant and attorney was limited to a small writing space crowded into a block-seating arrangement. Bleachers were installed. Seating charts were issued to jurors and trial participants to facilitate identification. A special intercom system of dubious efficacy was installed for 'bench conferences.'  When an attorney wished to address the court and fellow counsel privately, the jurors were treated to background music. However, this intended distraction proved futile, and counsel turned to the time-honored method of hushed voices and bowed heads. In sum, the courtroom

32

assumed the appearance of an overcrowded classroom.

*Id.*; *see also United States v. Gray*, 173 F. Supp. 2d 1, 10 (D. D.C. 2001) (holding that physical limitations of courtroom in trial of seventeen defendants was one reason to sever, despite presumption favoring joinder); *United States v. Shea*, 750 F. Supp. 46, 50 (D. Mass. 1990) (noting "added problem" that courthouse facilities for accommodating multi-defendant criminal trials are extremely limited).

### E.    Severance Determination

Severance determinations must be made in light of the unique circumstances and facts of each criminal indictment. In this case, after carefully reviewing and applying the numerous considerations and concerns set forth by Judge Aspen in *Andrews* and the dissent in *Warner*, this Court has decided to sever the trial.

As stated above, a joint trial of fourteen defendants could not even physically be tried in one courtroom, much less fairly, in this case. A joint trial in this case has the potential to last longer than five-months, and all of the risks of prejudice from such long trials apply here. The facts of this case are complex: different defendants are named in four different conspiracies—the RICO conspiracy, two murder conspiracies, and a drug conspiracy. Even with the clearest limiting instructions, it would be unreasonable to expect the jury to be able to separate out the evidence and connect it to the appropriate defendants for each different conspiracy. Additionally, the length of service for each jury will be reduced as the government's presentation of evidence will be more streamlined and focused in each trial, and the smaller number of attorneys will reduce the amount of argument and cross-examination. Accordingly, the government's proposed plan to try all fourteen defendants in one single consolidated trial would be prejudicial to the

33

defendants and unworkable for all the reasons addressed in *Andrews* and *Warner*.

## VI. Severance Proposals

In addition to the various motions to sever into individual trials, discussed above, several defendants and the government have put forth plans to sever the trial into groups of defendants.

### A. Severance into Three Trials

Salazar proposes that the Court sever the case into three separate trials: (1) the alleged leadership (Benabe, Juarez, and Salazar); (2) the alleged direct participants in acts of violence (Delatorre, Crowder, Susinka, Perez, Hernandez, Guzman, and Handley); and (3) the alleged older members of the gang (Morales, Rodriguez, Barbosa, and Lechuga). (R. 507, Salazar Mot. to Sever at 3.) Salazar argues that this division will require the government to target testimony and witnesses necessary for a particular set of defendants. (*Id.*) This Court disagrees. Handley is not alleged to have been a direct participant in any acts of violence, and the Indictment arguable charges Morales and Barbosa with greater participation in direct acts of violence than Perez and Hernandez. Accordingly, the Court believes that this severance proposal would result in unnecessary duplication of the evidence presented and lengthen the total trial time.

### B. Proposals for Two Trials

#### 1. Government's Suggested Severance

While the government maintains that this Court should jointly try the fourteen defendants, it has proposed a way to sever the trial should this Court determine that severance is necessary, which this Court shall refer to as the government's "forced severance plan." (R. 461, Gov't Statement Regarding Severance.) The government's forced severance plan is based on chronology, in which the first trial would include the alleged top gang leaders (Benabe, Juarez,

and Salazar), and the direct participants in the first four violent acts the government intends to prove (Delatorre, Crowder, Susinka, Perez, and Hernandez), which were committed between January and March 2002. (*Id.* at 3.) The second trial would include defendants who had no direct involvement in these first four acts and who became more active in the gang after gang meetings that occurred in June and July 2002 (Morales, Rodriguez, Barbosa, and Lechuga) and two alleged direct participants in acts committed after June 2002 (Guzman, Handley). (*Id.* at 4.) Defendant Guzman, while maintaining his desire to be tried alone, prefers the government's proposed severance to the other defendants' proposals. (R. 511, Guzman Resp. to Gov't Severance Proposal at 1.) Although the government will not commit to the likely scenario that evidence at either trial could be truncated as a result of the severance, the government contends that evidentiary overlap would be minimized by such a chronological division.

### 2. "Violent" Versus "Non-Violent" Offenses

In his first of two severance proposals, Defendant Rodriguez requested that this Court sever the trial between defendants who were alleged to have committed at least six acts of violence and those who were alleged to have participated in two or less acts of violence, but not as the shooter. (R. 342, Rodriguez Mot. to Sever at 8.) This would place Rodriguez, Handley, Lechuga, Susinka, Horton, and Hernandez together in one group, and Juarez, Salazar, Delatorre, Benabe, Barbosa, and Morales in a second group. Rodriguez was undecided on which group to place Perez and Guzman, who were the alleged shooters in two acts of violence. (*Id.*) Alternatively, Rodriguez suggests severing the trial into three groups, by further dividing "non-violent act allegation defendants" from defendants involved in "minimal acts of alleged violence." (*Id.* at 8-9.)

35

The Court rejects Rodriguez's proposal. The fact that certain defendants did not participate in the alleged underlying crime themselves does not shield them from the allegations in this conspiracy case since "every member of a conspiracy is substantively culpable for other conspirators' acts within the scope of the conspiracy." *Hoover*, 246 F.3d at 1057-58; *see also Goines*, 988 F.2d at 759-60 ("Minor members of a conspiracy run the risk of prosecution for every crime committed in furtherance of the conspiracy, even crimes in which they did not directly participate."). Conversely, the alleged leaders of the conspiracy may have "controlled the conspiracy from afar." *Wilson*, 481 F.3d at 482-83 (holding that the fact that the defendant did not personally sell drugs "proves nothing" as he was charged as the leader who controlled the conspiracy); *Hoover*, 246 F.3d at 1057-58 (holding that convictions were valid whether or not defendant leaders personally committed the predicate offenses on which the convictions depended).

### 3. The Remaining Defendants' Severance Proposals

In response to the government's forced severance plan, Handley and Rodriguez have filed additional severance proposals that would group Guzman, Benabe, Juarez, Salazar, Delatorre, Crowder, and Susinka in the first trial, and Handley, Rodriguez, Barbosa, Lechuga, Morales, Hernandez, and Perez in the second trial. (R. 500, Rodriguez Reply to Gov't Severance Plan at 2; R. 503, Handley Resp. to Gov't Severance Plan at 3.) Defendant Barbosa adopted Handley's proposed grouping of the defendants. (R. 509, Barbosa Resp. to Gov't Severance Plan.) This division is the same as Salazar's original severance proposal, in which Salazar sought to sever the trials between those defendants originally charged in capital counts, and the non-capital defendants. (R. 457, Salazar Pos'n Statement at 2.) Benabe adopted Salazar's original severance

36

proposal. (R. 485, Benabe Mot. to Adopt Salazar's Severance Proposal; R. 513, Benabe Resp. to Gov't Severance Plan.)

Handley argues that the government's "forced" severance plan, joining Guzman with the second group of defendants, would prejudice defendants Handley, Rodriguez, Barbosa, Lechuga, and Morales because unlike Guzman, the other defendants are not alleged to be "actual shooters or murderers." (R. 503, Handley Resp. to Gov't Severance Plan at 2.) Handley argues that Guzman's alleged conduct is "roughly equivalent" to the other group of defendants. (*Id.* at 2-3.) While this analysis misrepresents the Indictment—Morales and Barbosa are charged with committing multiple murders as part of the RICO conspiracy count—this proposed severance plan will best ensure fairness to each defendant and alleviate the particular concerns of these mega-trials.

### 4.    The Court's Severance Plan

This Court has carefully considered each of the parties' proposed severance plans. We have also reviewed the Indictment to see how defendants could, or could not, be logically tried together according to the offenses with which they are charged so as to preserve the judicial economy inherent in group trials as much as possible. This Court has attempted to make a division which satisfies the principal concerns of efficiency and fairness. *See, e.g., Kennedy*, 819 F. Supp. at 1517. The Court believes that the division into two groups of equal size, as proposed by four of the defendants, best achieves those objectives. Accordingly, the defendants will be grouped as follows. Guzman, Benabe, Juarez, Salazar, Delatorre, Crowder, and Susinka will be tried together; and Handley, Rodriguez, Barbosa, Lechuga, Morales, Hernandez, and Perez will be tried together.

This division groups the alleged leaders of the conspiracy together in one trial, and the less major players together in a second trial. Based on the Indictment and the government's representations in its briefs, it appears that Guzman played a larger role in the alleged conspiracy than the defendants in the second group. Placing Guzman with the leaders of the conspiracy will better serve the goals of efficiency and fairness than placing Guzman with the less major players, even though the Indictment charges Guzman with specific offenses occurring after the gang meetings in June and July of 2002.

This division also comes close to achieving the temporal overlap in offenses sought by the government. Although Perez and Hernandez, whom the government grouped with the alleged leaders of the conspiracy, are alleged to have participated in crimes before the June and July 2002 gang meetings, their participation in the earlier crimes is more minor than the leading participants in the conspiracy. In addition, the one non-conspiracy charge against Perez—Count Eight—alleges that the offense took place in May 2003, thus overlapping with offenses charged against some of the older gang members who became more involved in the gang after the June and July 2002 gang meetings.

In order to best satisfy the defendants' rights to a speedy trial, this Court will seek to have the two trials in this case proceed simultaneously by using the services of a volunteer judge. This Court also seeks to minimize the burden on witnesses who must testify at both trials. By proceeding simultaneously rather than consecutively, the concern that a witness who testifies at the first severed trial may be intimidated or otherwise prevented from testifying in the second trial is reduced. More importantly, proceeding in this manner will avoid any further delays for the detained defendants, who are presumed innocent. Additionally, as previously announced in

open court, this Court will attempt to minimize the remaining mega-trial prejudices identified in

*Andrews* and in this opinion by using time limits and other trial procedures which should

enhance the efficiency of the trial. These procedures are outlined in the order attached to this

opinion as Attachment A.

## CONCLUSION

While each individual indictment and case is different, these mega-indictments should

not be lightly brought by the U.S. Attorney's office. "[A] prosecutor has an obligation to use

some measure of restraint and to consider the effect of a sizable indictment on the integrity of the

resulting trial." *Andrews*, 754 F. Supp. at 1179. This is still an important concern, even

seventeen years after *Andrews*. This Court fervently hopes that the U.S. Attorney's office will

seriously consider the issues raised by this opinion before joining more than ten individuals in

one indictment.

Although we have found that a joint trial will not prejudice defendants in a traditional

sense, we are nevertheless seriously concerned by the systematic heavy burden that a fourteen-

defendant case places on the criminal justice system and most importantly, on the jury system

and jury selection process. Accordingly, as explained above, this Court will sever the trial into

two groups: Guzman, Benabe, Juarez, Salazar, Delatorre, Crowder, and Susinka in one trial; and

Handley, Rodriguez, Barbosa, Lechuga, Morales, Hernandez, and Perez in the other trial. This

Court will seek to have the two separate trials proceed simultaneously to maximize fairness and

efficiency.

Further, Benabe's motion to sever is granted, for the reasons identified herein. (R. 347,

Benabe Mot. to Sever.) Benabe's trial on the severed weapons charges will proceed before this

Court after his joint trial. Defendant Miguel Martinez remains a fugitive and is hereby severed because he has not been arrested and has not voluntarily surrendered in time to effectively participate in this trial. Martinez's trial will proceed before this Court within a reasonable period of time after he is arrested or self-surrenders.

A severance ruling by definition is a conditional ruling that could change as the trial begins to take form and evidence is presented. This Court will continually evaluate the propriety of joinder among the defendants. *See, e.g., Gray*, 173 F. Supp. 2d at 18 (citing *Schaffer v. United States*, 362 U.S. 511, 516 (1960)). Accordingly, Defendants may renew their individual requests for severance as the trial unfolds, and the Court will reconsider the issue as appropriate.

ENTERED:

Judge Ruben Castillo
United States District Court

Dated: November 21, 2007

40

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 03 CR 90 |
| | ) | Judge Ruben Castillo |
| FERNANDO DELATORRE, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

### Proceedings at Trial

Given the number of defendants and the parties' estimates concerning the length of time required for the trial of this case, it is appropriate that the Court establish the following procedures to be followed and applied during trial:

1. On or before December 3, 2007, the government will be required to file a written request for the number of trial hours it will request to try its case-in-chief. Thereafter, on December 14, 2007, the defendants will be required to file a similar request. The Court will then impose reasonable, non-arbitrary time limits for the trial of this case. *See United States v. Vest*, 116 F.3d 1179, 1186-88 (7th Cir. 1977).

2. This Court will hold an evidentiary hearing on January 11, 2008, to resolve all disputed issues of evidence, including admissibility of specific co-conspirator statements against all defendants. Counsel for all parties are requested to exchange trial exhibit lists on or before January 7, 2008. To avoid duplication of effort, the defendants' attorneys from each trial shall coordinate and attempt to file, to the extent possible, a joint exhibit list. Counsel for all parties

**ATTACHMENT A**

are hereby directed to file any motions in limine regarding disputed evidentiary matters no later than December 18, 2007. No motions in limine should be filed without a statement that an unsuccessful good faith attempt was made to reach agreement with opposing counsel regarding the disputed evidentiary matter. The Court will not entertain any argument or evidentiary objections in front of the jury during the trial if the disputed evidentiary issue is a matter that reasonably should have been raised by counsel during the Court's evidentiary hearing of January 11, 2008. The Court will attempt to resolve as many disputed evidentiary matters as possible on January 11, 2008, to avoid and minimize evidentiary problems during the trial.

3. Counsel shall submit one week before trial, in writing, suggested voir dire questions to be asked of the jury panel by the Court. All voir dire examination will be conducted by the Court pursuant to Federal rule of Criminal Procedure 24(a).

4. With respect to the selection of the jury, the defense may have one additional peremptory challenge for each defendant on trial at the time the case is called (up to a maximum of ten additional challenges), provided all defendants agree that the government may have a proportionate increase (60% of total defense challenges); otherwise the defense shall have ten peremptory challenges and the government six in accordance with Fed. R. Crim. P. 24(b). The Court will announce, prior to the selection of the jury, the number of alternate jurors to be selected and the number of peremptory challenges to be allowed under Rule 24 for selection of the alternates.

5. The attention of all counsel is directed to this Court's standing order of March 2, 2006, which concerns matters of etiquette, decorum, and procedure that will govern during trial. Pursuant to that order, the trial of this case will be held between the hours of 9:30 a.m. and 4:30

2

p.m., Monday through Thursday. On Fridays, however, the trial will proceed from 9:00 a.m. to 1:00 p.m., without a lunch break. The Court will recess for the weekend. This will allow the jury members, attorneys, and the Court to attend to other matters during this trial.

6. Defense counsel are directed to elect and designate one of their number as "lead" counsel for the purpose of announcing challenges during jury selection and otherwise acting as liaison counsel in dealing with government attorneys or the Court during the trial.

7. Defense counsel from each trial are also directed to confer and designate to the Court at the time of trial the sequence in which they wish to be recognized during trial for witness purposes. In the absence of agreement, counsel will be recognized in the order in which the defendants are named in the Indictment. During the progress of the trial itself, counsel may alter the usual sequence of recognition by handing up a list of those lawyers desiring to cross-examine each government witness expected to be called that day, and the sequence in which they wish to be recognized.

8. Once the case is called for trial, any objection, motion, or other application for relief made by any defense counsel orally or in writing shall be deemed adopted and joined by every other defendant, respectively, without announcement by counsel to that effect, and the rulings of the Court shall be deemed applicable to each defendant unless otherwise stated at the time the ruling is made. Accordingly, it will be unnecessary and improper for counsel to rise to "join in" an objection or motion. Counsel should rise to be heard only for the purpose of expressly opting out of an objection or motion if that is his or her position.

9. Government counsel is directed to deliver to defense counsel each evening, if not earlier, a list of witnesses the government anticipates calling the next trial day. All remaining

3

Jencks Act or Brady material not previously produced pertaining to each witness on the list should also be delivered at that time. The next day, before the trial begins, defense counsel shall state the desired order of recognition and be ready to cross-examine without delay. Nevertheless, the government will not be absolutely bound by the list of witnesses because the prosecution may, in good faith, desire to change an intended order of proof, or it may become necessary to call a witness out of turn. If the government does not wish to identify a witness until he or she is called because of security concerns, this should be brought to the Court's attention in camera when the witness list excluding those names is delivered to defense counsel.

10. Any counsel desiring daily or expedited transcripts during trial should make immediate arrangements with the court reporter and should inform the Court and other counsel of such intentions.

11. Counsel are specially directed to Section IV of this Court's standing trial order, which governs the making and listing of tangible or documentary exhibits before trial.

12. All witnesses called to testify by any party at trial will be subject to the control of counsel who caused them to be served with a subpoena or who secured their voluntary appearance. Accordingly, upon completion of the testimony of a witness, it shall not be necessary or appropriate to inquire of the Court whether that witness may be excused; counsel may excuse the witness. If other counsel wish to have any witness available for recall later, and have not made prior arrangements for the appearance of the witness through service of a subpoena or by voluntary agreement, it will be the responsibility of that counsel to make an announcement at the time the witness steps down that he should remain in the environs of the Court for a reasonable time to permit such counsel an opportunity to secure and serve a subpoena

4

upon the witness and assume responsibility for his or her per diem and other expenses as provided by government rule or statute.

13. Except for a defendant-witness (because of Sixth Amendment implications), counsel calling a witness to testify should have no further discussions with that witness concerning the case or any aspect of his testimony after the witness has been tendered for cross-examination and until such time as the witness has been tendered back for redirect examination. At all other times, within the bounds of governing ethics and the law, counsel may pursue their discussions with witnesses during the trial.

14. Given the number of lawyers involved, bench conferences are impractical and the flow or continuity of the case may not permit a side bar each time an evidentiary problem is presented. Counsel will be required to state the legal basis for their objections without elaboration or argument (unless invited), and the Court may rule on the objection without additional discussion except in the most doubtful or critical areas. For purposes of "protecting the record" and assisting the Court of Appeals, counsel may explain or the Court may amplify its ruling on the record after the jury has been excused for a break, lunch, or for the day.

15. Counsel for the government shall submit its proposed jury instructions for each trial to the Court and to defendants' counsel two weeks prior to trial. Thereafter, counsel for the defendants in each trial shall meet and submit, to the extent possible, a set of consolidated defense instructions to the Court one week prior to trial.

ENTERED:

Judge Ruben Castillo
United States District Court

Dated:        November 21, 2007

6