IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

                          Plaintiff,

       v.

**MARIANO MORALES**, also known as
"Mar," **ARTURO BARBOSA**, also
known as "Chipmunk," **HAROLD
CROWDER**, also known as "H-Man,"
**MIGUEL RODRIGUEZ**, also known as
"Mental" and "Mento," **BRIAN
HERNANDEZ, LIONEL LECHUGA, and
ROMEL HANDLEY**, also known as
"Romellie,"

               **Defendants.**

**Case No. 03 CR 90**

**Hon. Harry D. Leinenweber**

## MEMORANDUM OPINION AND ORDER

On December 10, 2008, Defendants Mariano Morales ("Morales"), Arturo Barbosa ("Barbosa"), Harold Crowder ("Crowder"), Miguel Rodriguez ("Rodriguez"), Brian Hernandez ("Hernandez"), Lionel Lechuga ("Lechuga"), and Romel Handley ("Handley") (collectively, the "Defendants") were found guilty of multiple offenses, including racketeering conspiracy and narcotics conspiracy. The jury was unable to reach a verdict as to Defendant Steven Perez. Presently before the Court are Defendants' post-trial motions seeking acquittal or a new trial (R. 1324, 1325, 1327, 1328, 1329, 1330, 1332, 1381) and the Government's Consolidated Response (R. 1450). For the reasons stated herein, the motions are **denied.**

# I. **BACKGROUND**

The facts underlying this case, which involves members of the Insane Deuce street gang (the "Insane Deuces"), have been set forth in several opinions by this Court and by Judge Ruben Castillo and will not be repeated here, except as is relevant to the pending motions. *See, e.g., U.S. v. Morales*, No. 03 CR 90, 2009 WL 331518 (N.D.Ill., Feb. 10, 2009)*; U.S. v. Delatorre,* 581 F.Supp.2d 968 (N.D.Ill., 2008); *U.S. v. Delatorre*, 572 F.Supp.2d 967 (N.D.Ill., 2008); *U.S. v. Delatorre*, 522 F.Supp.2d 1034 (N.D.Ill., 2007); *U.S. v. Delatorre*, 508 F.Supp.2d 648 (N.D.Ill., 2007); *U.S. v. Delatorre*, 438 F.Supp.2d 892 (N.D.Ill., 2006). In short, the Government charged 16 members of the Insane Deuces with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), violent crimes - including murder and assault with a dangerous weapon, and narcotics conspiracy - in aid of the racketeering activity. *See* R. 227 (Second Superseding Indictment).

Prior to trial, Judge Castillo severed the trial of the defendants into two groups, and this Court agreed to preside over the trial of Defendants Morales, Barbosa, Crowder, Rodriguez, Perez, Hernandez, Lechuga, and Handley. *Delatorre*, 522 F.Supp.2d at 1056.[1]

---

[1] Of the defendants before Judge Castillo, Defendant Akeem Horton pled guilty, and Defendants Fernando Delatorre, Steven Susinka, Juan Juarez, Christian Guzman, Julian Salazar, Bolivar Benebe, and Harold Crowder were tried in a two-month trial that began in February 2008. *Delatorre*, 581 F.Supp.2d at 974-75. The jury was unable to reach a verdict as to Crowder on the conspiracy count, thus Crowder was joined for trial before this Court. *See id.*

The Court began the trial of these Defendants on April 2, 2008, but had to declare a mistrial shortly after opening statements when several jurors asked to be removed from the jury. R. 884.

On October 6, 2008, the Court began the two-month trial of Defendants Morales, Barbosa, Crowder, Rodriguez, Perez, Hernandez, Lechuga, and Handley. During the trial, the jury heard testimony from more than 100 Government witnesses and 14 Defense witnesses. *See* Trial Transcript ("Tr.") at 136-4140. Among the evidence was testimony of former Insane Deuce gang members now cooperating with the Government, including Orlando Rivera, a former high-ranking member of the Aurora Insane Deuces; undercover audiotapes of gang meetings; undercover videotapes; eyewitness identifications; and firearms, drugs, and gang-related documents recovered from Defendants' homes.

On December 10, 2008, after deliberating for approximately one week, the jury found Defendants guilty on all but one count (the conspiracy to murder charge against Defendant Morales). R. 1195, 1196, 1198, 1200, 1202, 1204, 1206, 1208. The jury was unable to reach a verdict on Defendant Perez, which required the Court to declare a mistrial as to that defendant. R. 1185. After further proceedings and deliberations, on December 11, 2008, the jury returned its verdict on Phase II, the special factual findings pertaining to sentencing in which the jury determined the amounts of cocaine, crack cocaine, and marijuana proven to be involved in the narcotics conspiracy. R. 1197, 1199, 1201, 1203, 1205, 1207.

Now before the Court are Defendants' post-trial motions alleging numerous reasons why each is entitled to acquittal, or alternatively, a new trial. *See* R. 1324, Lechuga's Mot. for Judgment of Acquittal and/or for a New Trial ("Lechuga Mot."); R. 1325, Rodriguez's Rule 33 Mot. for a New Trial and Rule 29(c) Mot. for Judgment of Acquittal("Rodriguez Mot."); R. 1327, Morales' Second Mot. for New Trial ("Morales Mot."); R. 1328, Hernandez's Mot. for a New Trial or a Judgment of Acquittal ("Hernandez Mot."); R. 1329, Handley's Mot. for Judgment of Acquittal or New Trial ("Handley Mot."); R. 1332, Barbosa's Post-Trial Mot. ("Barbosa Mot."); R. 1381, Crowder's Post-Trial Mot. for Judgment of Acquittal and/or for a New Trial ("Crowder Mot."). These motions are now fully briefed. *See* R. 1450, Govt.'s Resp. to Defs.' Post-Trial Mots. ("Govt. Resp.").

## II.  MOTIONS FOR ACQUITTAL

Defendants Crowder, Rodriguez, Hernandez, Lechuga, and Handley move for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) on the basis that there was insufficient evidence to support their convictions. First, the Court will address arguments common to multiple Defendants regarding the sufficiency of the evidence, and then it will consider contentions specific to individual Defendants.

### A.  Legal Standard

A motion for acquittal filed after the jury has returned a guilty verdict asks the Court to set aside the verdict and enter a judgment of acquittal. Fed. R. Crim. P. 29(c). A party challenging

a jury conviction based on sufficiency of the evidence "faces a steep uphill battle." *U.S. v. Graham*, 315 F.3d 777, 781 (7th Cir., 2003). However, a jury's verdict is not inviolate. *U.S. v. Radomski*, 473 F.3d 728 (7th Cir., 2007). In evaluating sufficiency of the evidence claims, a court "must determine whether after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *U.S. v. Moore*, 425 F.3d 1061, 1072 (7th Cir., 2005) (internal quotations omitted); *U.S. v. Carter*, 410 F.3d 942, 952 (7th Cir., 2005). When making this determination, courts "do not weigh the evidence or assess the credibility of witnesses." *U.S. v. Orozco-Vasquez*, 469 F.3d 1101, 1106 (7th Cir., 2006).

### B. Evidence Common to Multiple Defendants

#### 1. *Testimony of Orlando Rivera*

First, multiple Defendants argue that their convictions cannot stand because the Government's main informant, Orlando Rivera, a former high-ranking member of the Insane Deuces, was impeached. *See, e.g.,* Hernandez Mot. at 2-4; Handley Mot. at 1-5. Defendants contend that the Government's case depended entirely on Mr. Rivera's testimony, which they argue was inconsistent and unreliable as a matter of law.

Defendants' arguments about the inherent unreliability of Mr. Rivera's testimony amount to an attack on Mr. Rivera's credibility. The credibility of a witness is for the jury, not the court, to

decide. *Moore*, 425 F.3d at 1073. Even upon finding inconsistencies or other flaws in a witness' testimony, a court generally refrains from interfering with a jury's credibility determination when the jury "has chosen to credit crucial testimony with full knowledge of the many faults of the witness providing it." *Id.* A witness' testimony is not rendered "incredible as a matter of law" merely because the witness was "impeached by certain discrepancies in his story, by prior inconsistent statements, or by the existence of a motive to provide evidence favorable to the government." *U.S. v. Alcantar*, 83 F.3d 185, 189 (7th Cir., 1996). In order to obtain a new trial based on the credibility of a witness, a defendant must show that a witness's testimony was incredible, either because it would have been impossible for the witness to observe what he described, or because it would have been impossible for the event described by the witness to have occurred. *See U.S. v. Ortiz*, 431 F.3d 1035, 1039 (7th Cir., 2005).

During trial, Mr. Rivera testified for approximately seven days. Tr. at 393-1687. During his direct examination, Mr. Rivera testified about his prior involvement in the Insane Deuces, his cooperation with the Government, and his deal for immunity. Counsel for each Defendant had the opportunity to cross-examine Mr. Rivera thoroughly regarding his motives, prior offenses, inconsistent statements, and agreement with the Government. *See id.* at 1012-1687; *see, e.g., id.* at 1012-27 (motives, credibility, bargain for immunity, trial preparation, prior crimes, lies to police and in prior trial), 1039-

41 (drug dealing and lies to dealers), 1077-82 (memory and drug use), 1202-81 (prior violent crimes and drug use), 1325-27 (payments from the Government), 1432-38 (gang-related dangers in jail), 1586-89 (testimony during trial before Judge Castillo). During his cross-examination, Mr. Rivera admitted that he attempted murder "more than 47 times" and agreed that he would not "spend a day in prison for those murders or attempted murders" as long as he testified truthfully. *Id.* at 1036. He testified that, after agreeing to cooperate, he was relocated and reimbursed by the Government for his living expenses, food, and missed work. *Id.* at 1007, 1028. Mr. Rivera also conceded his limited knowledge about certain events and defendants. *See, e.g., id.* at 1188-90 (Defendant Crowder); *id.* at 1524-29, 1538-39 (Defendant Handley).

The jury was charged with assessing the extent to which Mr. Rivera's motives may have influenced his testimony and with determining whether inconsistencies in his testimony rendered it unreliable. The Court specifically instructed the jury that they must decide whether each witness' testimony was "truthful and accurate, in part, in whole, or not at all, as well as what weight, if any" the testimony should receive. *Id.* at 4828. The jury was told that they could consider multiple factors to evaluate a witness' testimony, including the witness' memory and any interest, bias, or prejudice. *Id.* The Court also instructed the jury that they could evaluate a witness' inconsistent statements, prior convictions, and immunity when determining his credibility. *See id.* at 4834-36.

- 7 -

After reviewing the record, the Court rejects Defendants'
contentions that Mr. Rivera's testimony was incredible as a matter of
law. After approximately three days of intense cross examination,
the jury was made well aware of potential weaknesses in Mr. Rivera's
credibility as a witness and testimony about specific events. The
jury was fully informed about the caution and care it should employ
in assessing the credibility of testimony, and the Court has no
reason to doubt that the jury understood and abided by the Court's
instructions. *See U.S. v. Puckett*, 405 F.3d 589, 599 (7th Cir.,
2005) (Courts presume "that jurors, conscious of the gravity of their
task, attend closely to the particular language of the trial court's
instructions in a criminal case and strive to understand, make sense
of, and follow the instruction given them."). For these reasons, the
jury is entitled to its credibility determination regarding Mr.
Rivera's testimony. *See Ortiz*, 431 F.3d at 1039.

## 2. *Evidence of a RICO Enterprise*

Second, multiple Defendants imply in their motions that there
was insufficient evidence of a RICO enterprise.

On Counts One, racketeering conspiracy, the jury was instructed
that the Government must prove three elements beyond a reasonable
doubt: (1) an agreement to conduct or participate in the affairs (2)
of an enterprise (3) through a pattern of racketeering activity. Tr.
at 4840-41; *see also U.S. v. Olson,* 450 F.3d 655, 664 (7th Cir.,
2006). The Court further broke down the elements of RICO and
explained what the Government must prove in order for the jury to

find an enterprise, a conspiracy, a pattern of racketeering activity, and an individual Defendant's membership in the racketeering conspiracy. Tr. at 4841-51. In a similar manner, the Court instructed the jury as to what the Government must prove under Count Nine, the narcotics conspiracy charge. *Id.* at 4855-59.

The Court finds no reason to challenge the jury's determination that the Insane Deuces constituted a criminal racketeering enterprise. The Government offered extensive evidence regarding the street gang operations of the Insane Deuces, including audio and visual recordings, cooperating gang member testimony, and the gang's by-laws, as well as evidence that its members, including Defendants, engaged in acts of violence against rival gang members and other victims. Overwhelming evidence established that the Insane Deuces functioned as a continuing unit with a definite structure, chain of command, and distinct roles for gang members; that members engaged in drug trafficking to benefit the gang; and that the gang operated a "caja" system, in which members had access to a common fund of money, drugs, and guns. *See, e.g.,* Tr. 415-27, 454-60, 914-15, 2330-40, 2992, 3279-96. This type of street gang operation constitutes a long-recognized form of a RICO enterprise. *See* 18 U.S.C. § 1961(4); *see, e.g., Olson,* 450 F.3d at 668 (the Latin Kings street gang); *U.S. v. Phillips*, 239 F.3d 829, 845-46 (7th Cir., 2001) (the Dawg Life street gang); *see also Delatorre* 581 F.Supp.2d at 975-76 (J. Castillo) (finding sufficient evidence to uphold the jury verdict that the Insane Deuces, Aurora chapter, constituted a RICO

- 9 -

enterprise).  The Court finds that a rational fact-finder could have found that an enterprise existed beyond a reasonable doubt.  Thus, the Court will not disturb the jury's verdict.  *See Moore*, 425 F.3d at 1072.

### C.  Evidence Specific to Individual Defendants

#### 1.  *Evidence against Defendant Crowder*

Defendant Crowder separately argues that no rational trier of fact could have found sufficient evidence against him on the racketeering charge.  Crowder Mot. at 1-2; *see also* R. 1112 (Crowder's Mot. for Judgment of Acquittal, filed Nov. 17, 2008).  Crowder contends that the Government failed to prove beyond a reasonable doubt that he was an Insane Deuce gang member or otherwise participated in the conspiracy.

The Court rejects Crowder's argument.  The jury heard evidence of Crowder's membership in the Insane Deuces, including cooperator testimony that identified him as "H-Man," and testimony that Crowder had previously been a Gangster Disciple and later became an Insane Deuce member and gunner.  Tr. at 436, 442-43, 839-40, 2386-90.  Throughout the trial, the Government offered evidence that a primary responsibility of an Insane Deuces gang member was to kill and attempt to kill rival gang members, particularly Latin Kings.  The evidence established that Crowder personally participated in numerous acts of racketeering, including the attempted murder of Latin King drug dealer Juan Corral, the murder of Robert Perez, and the shooting at the car of the Ernesto Rosas family (mistaking them for Latin

- 10 -

Kings). *See, e.g.,* Tr. at 621-26, 903-05, 956, 1648, 2140, 2185-89, 2276-77.

Based on the totality of the evidence, the jury determined that Crowder was, in fact, an Insane Deuce member and that he committed acts of racketeering in furtherance of the conspiracy. It is not the role of this Court to "weigh the evidence or assess the credibility of witnesses" in ruling on Crowder's sufficiency of the evidence claim, *see Orozco-Vasquez*, 469 F.3d at 1106, and the Court finds that a rational fact-finder could have concluded that Crowder was guilty of the racketeering conspiracy. Accordingly, the Court finds sufficient evidence to uphold Crowder's convictions.

### 2. Evidence against Defendant Rodriguez

Defendant Rodriguez argues that there is insufficient evidence supporting his convictions of RICO conspiracy and narcotics conspiracy. Rodriguez Mot. at 4-7.

The Court finds no merit to either argument. With respect to the racketeering conspiracy conviction, the Government provided substantial evidence of Rodriguez's longtime membership in the Insane Deuces, including audio recordings of Rodriguez self-identifying as a member of the gang and discussing making decisions as a leader in the organization. *See, e.g.,* Tr. at 435-37, 469-70, 509, 700-09, 732, 739-40. On these tapes, the jury also heard Rodriguez discuss the gang's plans for multiple violent acts, including fighting the rival Ambrose gang and dealing with an Insane Deuce members suspected of cooperating with the police. *See, e.g., id.* at 525, 740, 766,

- 11 -

985-87.  In addition, the Court finds that, based on the evidence presented during trial, the jury could have found that Rodriguez, acting as an Insane Deuce member, possessed and sold firearms to benefit the gang.  *See, e.g., id.* at 917-20, 2756-59, 3324-29.  In short, the Court finds sufficient evidence to uphold Rodriguez's racketeering conspiracy conviction.

Similarly, the evidence supporting Rodriguez's narcotics conspiracy conviction is supported by the evidence.  As discussed above, the Government offered ample evidence, including testimony from cooperating gang members, consensual recordings, and controlled purchases, that demonstrated that members of the Insane Deuces sold narcotics and that the gang benefitted from narcotics trafficking.  *See infra* at 9-11.  The Government's evidence showed that the Insane Deuces operated a "caja" system, in which gang members were able to sell drugs from the caja, giving back part of the profit to the caja.  *See id.*  Moreover, the evidence established that the gang operated a "free enterprise" system of drug dealing, which allowed members to purchase drugs from any source, including non-members, so long as the drug sales benefitted the gang in some way.  See id.

After reviewing the record, the Court finds no shortage of evidence supporting the jury's finding that Rodriguez was a member of the narcotics conspiracy.  Among other evidence, the jury heard an audio recording of a meeting on June 7, 2002, in which Rodriguez discussed the free enterprise system of drug trafficking and of his presence at a July 5, 2002 meeting, in which gang members discussed

use of drugs from the caja.  Tr. at 725, 735.  The Court, therefore, finds sufficient evidence to uphold both Rodriguez's racketeering conspiracy and narcotics conspiracy convictions such that disturbing the jury verdict on either counts would be improvident.  *See Moore*, 425 F.3d at 1072.

### 3. *Evidence against Defendant Hernandez*

Defendant Hernandez challenges the sufficiency of the evidence supporting his narcotics conspiracy conviction.  Hernandez Mot. at 1-4.  Specifically, Hernandez argues that the Government did not provide sufficient evidence proving that he was a member of the conspiracy, participated in controlled buys of drugs, or sold drugs to benefit the Insane Deuces.  Hernandez also challenges the sufficiency of the evidence supporting his liability for the quantities of drugs indicated in the special verdict forms.

The Court rejects Hernandez's arguments.  The Court finds that the jury heard ample evidence regarding Hernandez's membership and rank in the Insane Deuces and that Hernandez participated in the narcotics and weapons trafficking alleged by the Government.  *See, e.g.,* Tr. at 433-34, 2360-64, 2990.  The Government presented evidence that Hernandez was present at the June 7, 2002 meeting where the caja was discussed; a recorded audio conversation from May 2002 in which he requested drugs from a Government informant; and a July 2002 video recording that captures him selling narcotics.  *See, e.g., id.* at 674-76, 681-82.  Based on this and other evidence at trial,

- 13 -

the Court finds that a reasonable jury could convict Hernandez on the narcotics conspiracy charge. *Moore*, 425 F.3d at 1072.

### *4. Evidence against Defendant Lechuga*

Defendant Lechuga argues that his racketeering and conspiracy convictions cannot stand because no reasonable jury could have found that he did not withdraw from the conspiracies. Lechuga Mot. at 1-8. Lechuga contends that the Government failed to meet its burden of providing sufficient evidence contradicting his withdrawal from the conspiracy or that he agreed to rejoin the Insane Deuces.

A proper withdrawal is a defense to conspiracy. *See U.S. v. Read*, 658 F.2d 1225, 1232-34 (7th Cir., 1981). "In order to withdraw from a conspiracy, a defendant must cease his activity in the conspiracy and take an affirmative act to defeat or disavow the conspiracy's purpose, either by making a full confession to the authorities or by communicating his withdrawal in a manner reasonably calculated to inform his coconspirators." *U.S. v. Bullis,* 77 F.3d 1553, 1562 (7th Cir., 1996). A defendant's conduct after a purported withdrawal is relevant to determine whether the withdrawal was complete and in good faith. *Id.* The defendant bears the initial burden of providing evidence that he withdrew. *Read*, 658 F.2d at 1236. Once this burden is satisfied, the government must "disprove the defense of withdrawal beyond a reasonable doubt." *Id.* A defendant's proper withdrawal starts a five-year statute of limitations, which can bar prosecutions for conspiracy made outside that five-year window. *See id*. at 1233.

Lechuga first argues that the evidence at trial clearly established that he withdrew from the conspiracy by retiring from the Insane Deuces in 1996. Lechuga points to audio tapes of two meetings in which he discusses his prior decision to retire, rather than be made a senior member of the Insane Deuces. *See* Lechuga Mot. at 4-5. In support of his argument, Lechuga contends that the Government's main witness, Orlando Rivera, conceded during cross-examination that Lechuga believed that he was retired from the gang. *See* Lechuga Mot. at 5; *see also* Tr. at 1446-56.

Second, Lechuga contends that the Government was unable to prove beyond a reasonable doubt that he agreed to rejoin the Insane Deuces. According to Lechuga, aside from evidence of his mere presence at two gang meetings during 2002, the Government put forth no evidence that Lechuga actually intended to rejoin the Insane Deuces or agreed to rejoin the Insane Deuces.

In response, the Government maintains that there was ample evidence that: (1) Lechuga never withdrew from the Insane Deuces' conspiracy, and (2) if he did withdraw, he rejoined the conspiracy in 2002. *See* Govt. Resp. at 11-15. First, the Government argues that Lechuga's purported "retirement" from the gang was merely a period of inactive status and did not constitute a legal withdrawal from the conspiracy. *Id.* at 12 (citing *Bullis*, 77 F.3d at 1562). According to the Government, as supported by the definition of "retirement" in the gang's by-laws, at all times during the time period of the conspiracies, Lechuga was a member of the Insane Deuces. Before June

2002, Lechuga was a Senior member, and after June 6, 2002, he was "rolled back" to the status of Junior member. *See* Tr. at 445. The Government asserts that Lechuga's own recorded words at the June 7, 2002 meeting demonstrate his ongoing membership in the Insane Deuces and the conspiracy. Second, the Government asserts that, even if Lechuga had withdrawn from the conspiracy, his active participation in the gang meetings on June 7, 2002, and July 5, 2002, demonstrate that he rejoined the conspiracy.

The Court finds that the Government presented sufficient evidence for the jury to find either that Lechuga never withdrew from the conspiracy or that he rejoined the conspiracy. The law is clear that "[i]nactivity alone does not constitute withdrawal from a conspiracy, the defendant must terminate completely his active involvement in the conspiracy, as well as take affirmative steps to defeat or disavow the conspiracy's purpose." *U.S. v. Hargrove*, 508 F.3d 445, 449 (7th Cir., 2007) (internal quotations omitted). The jury was presented with audio recording of conversations during the June 2002 and July 2002 meetings, during which Lechuga participated in decisions regarding the operations and future of the Insane Deuces and weighed in potential changes to the bylaws, use of the caja, eligibility for promotion in gang ranks, and problems with rival gangs. *See, e.g.,* Tr. at 681-84, 703-09, 735-42; *see also* Tr. at 761-63 (use of caja during 2002). The Insane Deuces' bylaws suggest that "retirement" from the gang does not entail that the member permanently ceases gang activity:

- 16 -

> Once a member of the organization, always a
> member. If you retire, then you shall be a
> retired member, non-active member, unless the
> member disrespects the Nation in such a way that
> its intolerable to become addicted to drugs or
> is a homosexual or trick, trick meaning telling
> on another member of this organization.

*See id.* at 3290-91.

In this case, the jury was provided a specific instruction regarding Lechuga's theory of his defense of withdrawal, what he needed to prove to succeed in this defense, and what the Government needed to establish for the jury to convict. *Id.* at 4860. The jury was entitled to assess the probative value of the evidence in its determination regarding whether Lechuga withdrew as a member of the conspiracy, and the Court finds that Lechuga has not demonstrated that, as a matter of law, no reasonable juror could have convicted on the evidence presented. *See Moore*, 425 F.3d at 1072. Consequently, the Court finds that there was sufficient evidence upon which a reasonable jury could have found Lechuga guilty beyond a reasonable doubt on the racketeering and narcotics conspiracy charges against him.

### 5. *Evidence against Defendant Handley*

In his motion, Defendant Handley contends that, each piece of evidence offered against him, even when viewed in the light most favorable to the prosecution, is "fraught with undeniable reasonable doubt," such that his conviction cannot stand. Handley Mot. at 2. Handley first challenges the credibility of testimony and evidence provided by Orlando Rivera, which implicates Handley in gang-related

activities, including the provision of firearms to other gang members. Likewise, Handley criticizes the testimony of another Government cooperator, Akeem Horton, regarding Handley's involvement in the "Wild West" shooting, and the contradictory statements of two other Government witnesses. *See id.* at 1-5.

Second, in his motion for a new trial pursuant to Rule 33, Handley argues that the indictment against him should be dismissed because the Government failed to prove the "essential factual allegations in the indictment" at trial, "thereby resulting in a fatal variance." *Id.* at 8-11. Handley argues that the Government alleged in the indictment only that he was an Insane Deuce member, held the rank of Second Seat Shorty, and gave orders in that capacity, but the Government did not prove that Handley held the position of Second Seat Shorty during trial. According to Handley, because the Indictment makes no other factual allegations against him, it would have been invalid on its face without the inclusion of his alleged rank in the gang, and the fact of his rank was "necessary and material" to the Indictment. *Id.* at 9-10.

In the Government's view, Handley's convictions are amply supported by the record. According to the Government, Handley's rank in the Insane Deuces is immaterial, and his membership in the gang and agreements to commit violent acts and to sell drugs as an Insane Deuce are demonstrated by overwhelming evidence, including in-court identifications, testimony from cooperating witnesses, and audio recordings of conversations between gang members. *See, e.g.,*

- 18 -

Tr. 428-29, 451, 661, 756-57, 813-14, 856-57, 2349-56, 3004-07.  For example, an Aurora police officer testified that, during a February 2002 interview, Handley told him that he was "a King killer and a Deuce for his whole life."  *See id.* at 3635-36; *see also id.* at 3641.  The Government also contends that its evidence showed that Handley possessed Insane Deuce firearms, at least one of which was used in gang-related a shooting.  *See, e.g.,* Tr. at 670, 794-95.

The Court agrees with the Government.  In ruling on Handley's motion for acquittal, the Court must view the evidence as a whole to determine whether any rational juror could have found that the Government proved the elements of the crime beyond a reasonable doubt.  *See Moore*, 425 F.3d at 1072.  As discussed above, the jury's determination regarding the credibility of witnesses is entitled deference, and the Court finds that the testimony of Rivera, Horton, and the other two government witnesses are not unreliable as a matter of law.  *See id.* at 1073.  The Court finds that the evidence against Handley supports the jury's verdict.  While Handley might disagree with the weight or credibility of the evidence, the Court finds that the jury could reasonably have credited it.  The jury heard sufficient evidence that Handley was a member of the conspiracy.

The Court also finds that any variance between the facts alleged in the Indictment and the evidence at trial does not require reversal of Handley's conviction.  "A variance arises when the facts proved by the government at trial differ from those alleged in the indictment."  *U.S. v. Avila*, 557 F.3d 809, 815 (7th Cir., 2009).  The Seventh

Circuit treats conspiracy variance claims "as an attack on the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy." *U.S. v. Rollins*, 544 F.3d 820, 836 (7th Cir., 2008). Thus, in order to succeed on his claim, Handley must show that the evidence at trial was insufficient to support the jury's finding that he was a member of the conspiracy and that he was prejudiced by the variance. *See id.*

The Indictment charged Handley and his co-defendants with a racketeering conspiracy. As discussed above, the Government provided sufficient evidence that Handley was a member of the charged conspiracy. The variance alleged by Handley relates to the Government's purported failure to prove his precise position in the Insane Deuces. As an initial matter, based on the evidence during trial, the Court finds that the jury could have determined that Handley held a leadership position in the Insane Deuces. *See* Tr. at 428-29 (rank of Shorty Enforcer in 2002). Furthermore, the Government was not required, as a matter of law, to prove Handley's exact rank in the gang in order to prove the charge of racketeering conspiracy beyond a reasonable doubt. *See Olson,* 450 F.3d at 663-64. The jury was entitled to assess the evidence of Handley's alleged rank along with all other evidence against him in deciding whether the Government met its burden of proof. Accordingly, the Court cannot say that the Government failed to prove the charges set forth in the Indictment or that Handley was prejudiced by the purported variance. *See Rollins*, 544 F.3d at 836.

- 20 -

For all of these reasons, the Court rejects Defendants' motions for acquittal based on sufficiency of the evidence.

### III.  MOTIONS FOR A NEW TRIAL

For various reasons, Defendants also move for a new trial pursuant to Federal Rule of Criminal Procedure 33.

### A.  Legal Standard

Upon a defendant's motion, a court "may vacate any judgment and grant a new trial if the interest of justice so requires." FED. R. CRIM. P. 33.  The decision of whether to grant a new trial pursuant to Rule 33 is within the court's discretion. *See U.S. v. Van Eyl*, 468 F.3d 428, 436 (7th Cir., 2006).  If the basis for seeking a new trial is not due to newly discovered evidence, the court must determine if a new trial is warranted because there exists "a reasonable possibility that a trial error had a prejudicial effect upon the jury's verdict." *Id.*  The court may order a new trial where the evidence "preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *U.S. v. Reed*, 875 F.2d 107, 113 (7th Cir., 1989).  However, the Court's power bestowed "by Rule 33 is reserved only for the most extreme cases." *U.S. v. Linwood*, 142 F.3d 418, 422 (7th Cir., 1998).

### B.  Denial of Severance Motions

Several Defendants argue that the Court erred in denying their pretrial and oral motions for severance and that they should be granted new trials because they were unfairly prejudiced by the joint

trial. *See, e.g.,* Crowder Mot. at 2; Rodriguez Mot. at 3-4; Lechuga Mot. at 9; Handley Mot. at 5-8.

In order for Defendants to prevail on their argument that the Court erred in denying their motions for severance, Defendants must show prejudice. *U.S. v. Warner*, 498 F.3d 666, 700 (7th Cir., 2007) (citing *Zafiro v. U.S.*, 506 U.S. 534, 538-39 (1993)). "Limiting instructions often will suffice to cure any risk of prejudice, and tailoring relief from prejudice is left to the district court's discretion." *Warner*, 498 F.3d at 700. In order to show actual prejudice from the joint trial, a defendant must show that more than that a separate trial would have given him a better opportunity for acquittal; instead, he must show that he was deprived of his right to a fair trial. *U.S. v. Rollins*, 301 F.3d 511, 518 (7th Cir., 2002).

Judge Castillo issued a comprehensive ruling on the issue of severance in this case on November 21, 2007, explaining his reasons for dividing the defendants into two groups for trial. *Delatorre*, 522 F.Supp.2d at 1044-59. In this opinion, Judge Castillo considered the risks associated with a joint trial and potential prejudice towards individual defendants, including antagonistic defenses, massive and complex evidence, incriminating statements of co-defendants, and the disparity in the weight of the evidence against the defendants. *Id.* at 1046-47 (citing *U.S. v. Clark*, 989 F.2d 1490 (7th Cir., 1993)). Judge Castillo concluded that, "[w]hile there are different degrees of culpability among the defendants, contrary to their claims, the evidence against individual defendants is not

- 22 -

widely varying, such that they would be prejudiced by the spillover effect from the evidence of allegations that do not apply to them." *Id.* Moreover, because each individual was charged with RICO conspiracy, "the vast majority, if not all, of the evidence admitted in the joint trial would have been admissible had the defendant been tried alone." *Id.* Because of the complexity of the case, the nature of the charges brought by the Government, and the relevant case law, this Court agrees with the substance of Judge Castillo's prior ruling.

In their motions, Defendants Crowder, Rodriguez, and Lechuga do not specify any specific prejudice caused by their inclusion in the joint trial. Defendant Hernandez argues that he was prejudiced by joinder by the admission of incriminating post-arrest statements made by other defendants. Hernandez Mot. at 5. Defendant Handley contends that he was prejudiced by his joinder because of the disparity between evidence against him and the evidence against other defendants. *See* Handley Mot. at 5-8. According to Handley, while the Government offered massive amounts of evidence against co-defendants, such as evidence of violent crimes and regular participation in drug dealing, the evidence against Handley differed in type and quantity and was not connected with the evidence against co-defendants. Handley argues that, after sitting through two months of testimony about other defendants and seeing evidence of violent crimes committed by others, the jury convicted Handley "for little more than being a willing associate" of his co-defendants. *Id.* at 8.

- 23 -

The Court rejects Defendants' arguments that they were prejudiced by the joint trial such that the jury was unable to consider the evidence against each Defendant and render a separate verdict as to each individual. Defendants were charged with participating in a RICO conspiracy, which, by it's very nature, involved multiple violent acts and drug trafficking. The Government was required to prove each of these acts in order to prove the existence of an enterprise, the pattern of racketeering activity, and each defendant's involvement in the conspiracy. *See Olson*, 450 F.3d at 663-64. Just as it considered their prior motions for severance, the Court now must consider their motions for a new trial in light of the RICO charges. *See U.S. v. Melton*, 689 F.2d 679, 685 (7th Cir., 1982) ("[U]nder RICO, defendants who committed certain acts of racketeering may be 'lumped together' with a defendant who committed certain other acts, since they are bound together by a purpose to further the illicit affairs of the enterprise, and not by the purpose of committing one single crime. Thus, the propriety of severance must be viewed against this background."). The Court further notes that the mere fact that racketeering conspiracies involve spillover evidence regarding predicate crimes committed by co-defendants does not necessitate separate trials for each defendant because each "member of the conspiracy is substantively culpable for other conspirators' acts within the scope of the conspiracy." *See U.S. v. Hoover*, 246 F.3d 1054, 1057-58 (7th Cir., 2001); *U.S. v. Souffront*, 338 F.3d 809, 831 (7th Cir., 2003).

The Court rejects Defendant Hernandez's specific argument that
he was prejudiced by the admission of incriminating post-arrest
statements made by other Defendants. The mere fact that spillover
evidence about a co-defendant is admitted during a joint trial does
not guarantee a defendant a new trial, especially if the court takes
steps to guard against potential prejudice. *See Souffront*, 338 F.3d
at 831 ("Proper jury instructions are an adequate safeguard against
the risk of prejudice in the form of jury confusion, evidentiary
spillover and cumulation of evidence."). Both during trial and in
its final instructions, the Court admonished the jury that it should
consider the testimony only as to the defendant who was alleged to
have made the statement. Tr. at 3639, 4833. The Court also
repeatedly instructed the jury to consider each count and its related
evidence separately.

> Even though the defendants are being tried
> together, you must give each of them separate
> consideration. In doing this, you must analyze
> what the evidence shows about each defendant,
> leaving out of consideration any evidence that
> was admitted solely against some other defendant
> or defendants. Each defendant is entitled to
> have his case decided on the evidence and the
> law that applies to that defendant.

*Id.* at 4838; *see also id.* at 4832 (advising the jury that the
Government bears the burden of proving the guilt of each defendant
beyond a reasonable doubt), 4865 (instructing the jury to "give
separate consideration both to each count and to each defendant" and
to "consider each count and the evidence relating to it separate and
apart from every other count"). The Court can presume that the jury

"attend[ed] closely [to] the particular language" of its instructions, including that the jury should "consider each count and the relating evidence separately." *U.S. v. Stokes*, 211 F.3d 1039, 1043 (7th Cir., 2000). The Court, therefore, rejects that the admission of these statements was erroneous, much less the argument that the admission was so prejudicial as to require a new trial for Hernandez.

As to Defendant Handley, the Court finds that it did not err in denying his prior motions for severance based on quantity and type of evidence alleged against him. *See U.S. v. Goines*, 988 F.2d 750, 759-60 (7th Cir. 1993) ("The government, however, may prosecute coconspirators on every level together, from the street dealer to those who run the show. . . . Minor members of a conspiracy run the risk of prosecution for every crime committed in furtherance of the conspiracy, even crimes in which they did not directly participate. As long as crimes were within the scope of the conspiracy they joined, they will be held liable."); *see also Delatorre*, 522 F.Supp.2d at 1048-49 (J. Castillo) (finding that Handley was properly joined and denying his pretrial motion for severance). As discussed in detail above, the Government offered sufficient evidence of Handley's membership in the Insane Deuces and his participation in the racketeering conspiracy. The Court rejects Handley's claims that the evidence offered against him was so vastly different from that offered against his co-defendants such that the jury was unable to render a careful verdict as to him as an individual.

- 26 -

The Court finds that Defendants have failed to show that the Court's denial of their motions for severance deprived them of a fair trial; thus, the Court will not order a new trial on this basis. *See Rollins*, 301 F.3d at 518.

### C. Additional Arguments for a New Trial

In their motions, Defendants assert various other arguments as to why this Court should grant each a new trial. The Government argues that the Court should deny each of these motions because the grounds are either (1) waived because undeveloped and unsupported, *see U.S. v. Turcotte,* 405 F.3d 515, 536 (7th Cir., 2005) ("[U]nsupported and undeveloped arguments are waived."); (2) harmless, *see Chapman v. California*, 386 U.S. 18, 22-24 (1967); *Warner*, 498 F.3d at 679; and/or (3) wholly without merit. *See* Govt. Resp. at 17-22. The Court will address Defendants' arguments in turn.

#### 1. *Purported Jury Bias*

Multiple Defendants argue that they are entitled to new trials because of evident jury bias. *See, e.g.,* Handley Mot. at 11; Lechuga Mot. at 9. After reviewing the record in this case and the applicable law, the Court fully considered and rejected this argument in its February 10, 2009 Memorandum Opinion and Order. *See Morales*, 2009 WL 331518. A district court has wide discretion in determining the seriousness of any potential juror bias, the credibility of sources of allegations of bias, and whether the bias requires a

mistrial. *See U.S. v. McClinton*, 135 F.3d 1178, 1186 (7th Cir., 1998). In this case, the Court has every reason to believe that the jury was free from any external pressure and that the jurors deliberated carefully and cooperatively to make determinations regarding the complex issues of the case. *Morales,* 2009 WL 331518, at *5.

### 2. *Admission of Evidence Regarding Prior Incarcerations*

#### a. *Defendant Barbosa*

Defendant Barbosa contends that he was denied a fair trial as the result of the admission of references to his prior incarceration, which he claims undermined the presumption of innocence and prevented the jurors from being able to fairly evaluate the evidence. *See* Barbosa Mot. at 1.

A defendant's prior crimes or bad acts may not, of course, be admitted to show his propensity to commit the criminal act charged, but may be admitted for other purposes, such as proof of motive, intent, or absence of mistake. FED. R. EVID. 404(b); *U.S. v. Yusufu*, 63 F.3d 505, 511 (7th Cir., 1995) ("[R]ule 404(b) permits the introduction of another crime, wrong, or act *unless* the sole purpose for the offer is to establish the defendant's propensity for a crime."). Evidence of prior convictions may also be admitted against a testifying defendant in order to attack his credibility if the court determines that the probative value of the evidence outweighs its prejudicial effect. *See* FED. R. EVID. 609(a)(1); *U.S. v. Toney*, 27 F.3d 1245, 1253-54 (7th Cir., 1994). Courts consider four factors

to determine whether the evidence of other crimes or acts should be admitted, namely whether:  (1) the evidence is directed toward proving a matter in issue other than the defendants' propensity to commit the crime charged; (2) the evidence shows that the other act is similar and close enough in time to be relevant to the matter at issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. *See Yusufu*, 63 F.3d at 511.

During trial, Barbosa elected to testify on his own behalf. *See* Tr. at 3871-3917.  During cross-examination, the Government produced evidence, without objection, that Barbosa was convicted of a shooting. *Id.* at 3902.  When asked whether he had the opportunity to sell drugs during an 11 or 12 year period during the 1990s and early 2000s, Barbosa admitted that he wanted to sell drugs but did not have the opportunity because he "was in prison . . . for the majority of that time." *Id.* at 3909.  Barbosa also testified that he only held a gun for the Insane Deuces on one occasion, explaining that "[f]rom '93 to 2002" he was in prison. *Id.* at 3912.  This testimony was all admitted without objections from Barbosa's attorney. *Id.*  At the end of the trial, the Court specifically cautioned the jury to consider evidence of Barbosa's convictions only in assessing the truthfulness of his testimony. Tr. at 4833.  The Court finds that the Government properly used Barbosa's prior convictions and incarcerations to challenge his credibility as a witness. *Toney*, 27 F.3d at 1253-54.

- 29 -

Additionally, this evidence shed light on Barbosa's participation in the Insane Deuces during the relevant time period, and, in light of the evidence against Barbosa, the probative value of this evidence was not outweighed by any unfair prejudice. *See Yusufu*, 63 F.3d at 511. At no point did the Government argue or imply that these convictions or incarcerations demonstrated Barbosa's propensity to commit the offenses charged. *Id.* For these reasons, the Court finds that the admission of Barbosa's prior incarcerations was proper.

Even if the admission of Barbosa's prior incarcerations was erroneous, this error would be harmless in light of the Government's evidence against him. Defendant Barbosa did not challenge his convictions based on sufficiency of the evidence; however, if he had filed this motion, the Court would have denied it summarily. *Moore*, 425 F.3d at 1072. The trial transcript is rife with evidence supporting Barbosa's membership in the Insane Deuces and active participation in the racketeering conspiracy and narcotics conspiracy. *See*, *e.g.,* Tr. 444, 741-42, 755-6l, 766, 3905-17 (Barbosa's cross-examination).

### b.  *Defendant Morales*

Defendant Morales argues that he is entitled to a new trial by virtue of the admission, over his objection and despite the fact that he chose not to testify, of evidence of his prior incarceration for narcotics-related offenses.

During trial, Government witness Special Agent Mark Anton ("SA Anton") recounted portions of Morales' post-arrest statement, during

which Morales admitted to being involved in narcotics trafficking from 1989 to 1995. Tr. at 3696-3705. Morales now objects specifically to SA Anton's testimony that Morales had stated that he "had gone in and out of the Illinois Department of Corrections for narcotics related offenses" and "went to the Illinois Department of Corrections in 1995 for delivery of cannabis." Morales Mot. at 1 (quoting Tr. at 3699-3700). Morales contends that, because he did not testify during trial, Federal Rules of Evidence 609(a)(1) and 404(a) prohibited the admission of evidence of his past crimes, and justice requires a new trial even if his case was otherwise free from error. *Id.* (citing *U.S. v. Beeks*, 224 F.3d 741 (8th Cir., 2000) (ordering a new trial where government asked a witness about non-testifying defendant's criminal history); *U.S. v. Nemeth*, 430 F.2d 704 (6th Cir., 1970) (reversing defendant's conviction despite cautionary instruction); *U.S. v. Rudolph*, 403 F.2d 805 (6th Cir., 1968) (ordering a new trial despite cautionary instruction in a case otherwise tried free from error)).

The Government maintains that the purported error alleged by Morales, if an error at all, was harmless. First, the Government argues that admission of SA Anton's testimony was not erroneous because the fact that the Insane Deuces continued their gang-related activities in prison was important evidence in the case. *See, e.g.,* Tr. 722-23 (audio of Rodriguez discussing the Insane Deuces' "defending [themselves] in the joint"). In the alternative, the Government contends that, in light of overwhelming evidence against

Morales, the admission of testimony about his prior incarceration surely did not affect the outcome of the trial and constituted harmless error.

The testimony disputed here was not of other crimes or acts, but of prior incarcerations, evidence that implies that Morales committed other bad acts. *See Yusufu*, 63 F.3d at 511. During trial, the Government did not suggest to the jury that the fact that Morales had been incarcerated made it more likely that he committed the charged crimes. Rather, the Government avers that the testimony was offered to provide context for the manner in which the Insane Deuces operated within the prison system. The trial did not dwell on Morales' prior incarcerations, and the Court instructed the jurors to consider of the convictions of trial witnesses only to determine the truthfulness of those witnesses' testimonies. Tr. at 4835-36. Based in part on the context of the admission of this evidence, the Court finds that the admission was proper. This evidence was directed toward proving the activity of the Insane Deuces in the prison system, rather than Morales' propensity to commit the crimes charged, and its probative value on this issue was not substantially outweighed by the danger of unfair prejudice. *See Yusufu*, 63 F.3d at 511; *see also U.S. v. Lashmett*, 965 F.2d 179, 185 (7th Cir., 1992) (upholding admission of evidence of defendant's incarceration that was linked in time and circumstances with the alleged crime such that it filled a "chronological and conceptual void" in the government's case and to

provide "the backdrop against which the alleged scheme was carried out").

Even if the admission of the testimony of Morales' past incarcerations was erroneous, in context of this long criminal trial alleging wide-ranging conspiracy and numerous violent crimes, this error was harmless. *See U.S. v. Webb*, 548 F.3d 547 (7th Cir., 2008). Like Barbosa, Morales did not move for acquittal based on sufficiency of the evidence. After reviewing the entire record, the Court finds overwhelming evidence to support Morales' convictions. Substantial evidence established that Morales was a longtime member of the Insane Deuces who moved through the ranks of the gang and became a Junior Enforcer in July 2002. *See* Tr. at 426-27, 432, 437, 487, 609. The Government also showed that Morales was fully aware of the gang's objectives to kill rival gang members and to sell drugs and that he took an active role in carrying out these goals. *See, e.g., id.* at 767-68, 960, 988-94. In fact, while recounting Morales' post-arrest statement, SA Anton testified:

> "[Morales] talked about how there is a standing order with the Insane Deuces, both juniors and shorties, that they were to shoot rival gang members on sight, that was just a standard order, that was - it was a general order out there, and they did not need authorization from any chain of command.
>
> However, he said we talked about missions, and he said a mission would be a shooting or a murder committed against a rival gang member, but that would take an order, and he went through the chain of command of how that command would come down. He said it would come down from the first seat junior to the second seat

> junior, down to the junior enforcer, then he
> would pass that order to the first seat shortie,
> and that first seat shortie would make the
> arrangements for a shortie to commit that."

*Id.* at 3704.

In light of the strength of the Government's case against Morales, the Court finds that, if the admission of evidence regarding Morales' prior incarceration for a narcotics related offense was erroneous, this error was harmless and is not grounds for a new trial. *See Webb*, 548 F.3d at 549.

### 3. *Evidence and Arguments Regarding Gang Affiliation*

Defendant Barbosa contends that he was deprived of a fair trial because of "repeated references and emphasis on" his gang affiliation. Barbosa Mot. at 2. Similarly, Defendants Hernandez and Rodriguez argue that the Government improperly argued that they should be convicted based on their mere involvement in a street gang, which Hernandez posits amounts to prohibited jury nullification. Hernandez Mot. at 4-5; Rodriguez Mot. at 4.

Courts must carefully consider proposed evidence of gang involvement in order to avoid undue prejudice to individual defendants. *U.S. v. Richmond*, 222 F.3d 414, 417 (7th Cir., 2000). Although evidence of gang affiliation may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, courts have "long recognized that gang membership has probative value under appropriate circumstances," particularly "in cases where the interrelationship between people is a central issue."

- 34 -

*U.S. v. Thomas*, 86 F.3d 647, 652 (7th Cir., 1996); *see also Richmond*, 222 F.3d at 417 (allowing evidence of gang involvement to show complete story of the conspiracy and firearms trafficking); *U.S. v. McKinney*, 954 F.2d 471, 479 (7th Cir., 1992) (allowing evidence of how gang controlled and disciplined members to show context of murder and conspiracy).

In this case, both before and during trial, the Court carefully considered the probative value and potential prejudicial effects of evidence regarding the operations of the Insane Deuces and Defendants' participation in the gang. At this time, the Court rejects Defendants' arguments in light of the charges in this case, the Government's use of evidence regarding gang affiliation, and the limiting instructions given to the jury. As a general matter, in this RICO conspiracy prosecution, the Government was required to prove beyond a reasonable doubt that the Insane Deuces constituted an enterprise, and that Defendants conspired to conduct or participate in the conduct of the affairs of the Insane Deuces through a pattern of racketeering activity. *See Olson*, 450 F.3d at 663-64. Thus, the Court finds that the Government's evidence of the interworkings of the Insane Deuces as an organized unit and it evidence of each Defendant's participation in the gang was appropriate.

Additionally, the Court finds that the Government's references to the Insane Deuces gang in its opening and closing arguments were not improper. In cases of alleged prosecutorial misconduct during argument, a court must first decide "whether the prosecutor's comment

considered by itself was improper and then examine the entire record to see if the improper comment deprived the defendants of a fair trial." *U.S. v. Andreas*, 216 F.3d 645, 671 (7th Cir., 2000); *see also U.S. v. Velez*, 46 F.3d 688, 691 (7th Cir., 1995). Here, Hernandez alleges that the Government encouraged the jury to convict Defendants based only on gang membership rather than on specific acts or agreements. After reviewing the record, the Court finds no evidence of improper arguments or implications or other misconduct. Instead, the Government focused its arguments on explaining the nature of the conspiracy and each Defendants' role in furtherance of the conspiracy's objectives.

Finally, the Court specifically instructed the jury that "[m]embership in a street gang alone is not a violation of the law" and that each juror should confine himself or herself "to considering the charges in this case . . . and not be emotionally swayed by the use of the word gang or Insane Deuces." Tr. at 4844. The Court has no reason to doubt that the jury carefully considered this instruction when reviewing the evidence against each defendant. *See Souffront*, 338 F.3d at 831. Accordingly, the Court, rejects Defendants' contention that the Government's evidence related to their gang affiliation deprived them of a fair trial.

### 4. *Statements with Racial Slurs*

Defendant Barbosa argues that he was deprived of his right to a fair trial because the Court refused to grant his request to redact racial slurs from his statements. Barbosa Mot. at 2.

- 36 -

The Government's case relied in large part on lengthy audio and video recordings of gang meetings, drug exchanges, and other interactions between Defendants, other gang members, and undercover cooperators. These recordings are replete with profanities, racial slurs, and other offensive and violent conversations. Specifically with regards to Barbosa, in many cases, the recordings capture Barbosa's derogatory language related to his statements regarding his violent attempts to kill rival gang members or Government cooperators. *See, e.g.,* Tr. 737 ("It ain't no problem with me. F--- it. Family or not, he's going to die."); 742 (referring to Latin Kings, "When I was there, bro, there was no Mother F'ing, there was no ands, ifs, or buts. You see one, you do his ass, plain and simple.").

The Court admitted these recordings in large part without redactions. The recorded words of Defendants were highly probative as to the conspiracy charges brought against them. In many cases, requiring redactions could alter or render meaningless Defendants' statements. The Court finds that, at worst, this decision constitutes harmless error. *See Chapman*, 386 U.S. at 24; *see also U.S. v. Bright*, 630 F.2d 804, 814 (5th Cir., 1980)(trial judge did not err in refusing to redact tape-recorded conversation in which defendants and FBI agents used racial slurs and other offensive language). In light of the overwhelming evidence against Barbosa, any prejudice created by the admission of his use of derogatory racial language was harmless.

- 37 -

### 5. *Evidence of Drug Quantity Amounts*

Defendant Rodriguez contends that the Court erred in admitting evidence of drug quantity amounts by: (1) allowing the proof of drug quantity amounts to be presented during the Phase II instructions, rather than the Phase I instructions, and (2) indicating in the Phase II instructions that Rodriguez was grouped together with his co-defendants in the quantity amounts. Rodriguez argues that these errors denied the jury the opportunity to decide whether he was individually responsible for any drug amount. Rodriguez Mot. at 4-5.

During its Phase II instructions, the Court charged the jury with determining whether particular defendants committed specific offenses and the types and amounts of controlled substances involved in the narcotics conspiracy as a whole. The findings during Phase II pertained to each defendant's potential sentencing range. With regards to its findings regarding specific offenses alleged in the racketeering conspiracy charge (Count I), the Court advised the jury to "give separate consideration both to each allegation and to each defendant." Tr. at 5070. As to the narcotics conspiracy count (Count IX), however, the jury was to determine the types and total amount of drugs involved in the narcotics conspiracy as a whole. *Id.* at 5079-80. These determinations were not to be "defendant specific" because "[a]s members of a conspiracy, each defendant is accountable for the acts of all other conspirators committed in furtherance of that agreement." *Id.* at 5080. The Court advised the jury that the Government was "not required to show that any defendant was involved

in, or even had direct knowledge of, any particular drug transaction or seizure." *Id.*

Rodriguez cites no case law to support his argument that the instructions regarding drug quantities were erroneous or violated his Due Process rights. After reviewing the jury instructions given in both Phase I and Phase II of this trial, the Court finds that its instructions conformed to underlying substantive law. *See U.S. v. Acosta*, 534 F.3d 574, 582 (7th Cir., 2008) (citing U.S.S.G. § 1B1.3(a)(1)(B)) (During sentencing, in cases of jointly undertaken criminal activity, a court may consider "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," including the drug sales of other conspiracy members); *U.S. v. Brumfield,* 301 F.3d 724, 733 (7th Cir., 2002). The Court, therefore, rejects Rodriguez's argument.

### 6. *Testimony from Government's Ballistic Expert*

Defendant Rodriguez contends that he was denied a fair trial because the Court allowed the Government's ballistic expert to opine "to a reasonable degree of ballistic certainty," rather it was than "more likely than not" that certain bullets came from certain weapons. *See* Rodriguez Mot. at 3 (citing *U.S. v. Glynn*, 578 F.Supp.2d 567 (S.D.N.Y., 2008)). Based on the law in this Circuit, the Court affirms its initial ruling on this issue and finds that the expert testimony regarding ballistics evidence in this case was not inherently unreliable. *See U.S. v. Mikos,* 539 F.3d 706, 710-12 (7th Cir., 2008); *U.S. v. Conn,* 297 F.3d 548, 555-57 (7th Cir., 2002); *see*

*also U.S. v. Hicks*, 389 F.3d 514, 526 (5th Cir., 2004) (ballistics testimony is generally accepted and admitted almost without question in federal courts).

### 7. *Defendant Rodriguez's Conduct before 1999*

Defendant Rodriguez also argues that the Court erred in denying his prior motion to bar evidence regarding his violent conduct occurring before 1999. Specifically, Rodriguez argues that he is entitled to a new trial on the basis of unfair prejudice resulting from the admission of testimony by Orlando Rivera about Rodriguez's involvement in the January 1995 gang-related shooting of a Latin King gang member. Rodriguez Mot. at 2. The Court agrees with the Government that Rodriguez's argument is meritless. The Indictment in this case described a racketeering conspiracy that began "at least from in or about late 1994." *See* R. 227 (Indictment Count I ¶ 9). The Government's evidence about Rodriguez's participation in the 1995 shooting clearly was probative as to both the conspiracy and Rodriguez's participation in the conspiracy.

### 8. *Autopsy Photographs*

Defendant Lechuga separately argues that he was denied a fair trial by the admission into evidence of autopsy photographs. Lechuga Mot. at 9. The Court considers this argument to be baseless. During trial, the Court admitted into evidence various autopsy photographs during the pathologists' testimonies; these photographs, however, were not displayed to the jury. Even if the Court had allowed these photographs to be shown to the jury, Lechuga's argument probably

would fail. *See Gonzales v. DeTella*, 127 F.3d 619, 621-22 (7th Cir., 1997) (holding that the admission of "grisly" pictures of dead drug dealers at trial was not a due process violation); *see also U.S. v. Davidson*, 122 F.3d 531, 538 (8th Cir., 1997) (permitting use of "graphic" autopsy photographs in conjunction with a doctor's testimony). Here, the photographs were not admitted. Thus, the Court cannot imagine the nature of the prejudice that could have resulted to Lechuga.

### 9. *Other Purported Errors*

Multiple Defendants contend that they are entitled to new trials based on the Court's purported errors in denying their prior motions. For example, Crowder, Rodriguez, and Lechuga argue that the Court erred in denying various motions before and during trial, including motions to dismiss, motions in limine, a motion for a bench trial, and objections during the Government's opening and closing arguments. *See* Crowder Mot. at 2-3; Rodriguez Mot. at 2-5; Lechuga Mot. at 9; Handley Mot. at 12. Similarly, Crowder, Hernandez, and Lechuga contend that the Court erred in denying their proposed jury instructions. *See* Crowder Mot. at 2; Hernandez Mot. at 5; Lechuga Mot. at 9. To support these arguments, Defendants fail to explain how the Court erred in its prior rulings, much less why such purported errors mandate a new trial. The Court agrees with the Government's position that these arguments are undeveloped and, therefore, are waived. *See Turcotte*, 405 F.3d at 536.

- 41 -

### 10.  *Cumulative Effect of Errors*

Finally, multiple Defendants contend that the "cumulative effect" of the Court's alleged errors necessitates a new trial. *See, e.g.,* Crowder Mot. at 3; Rodriguez Mot. at 5; Lechuga Mot. at 10; Handley Mot. at 12.  Having failed to successfully establish any error on the basis of the above arguments, this argument necessarily fails. *Cf. U.S. v. Santos*, 201 F.3d 953, 965 (7th Cir., 2000) (where trial had contained an "avalanche of errors," a court must "assess the harm done by the errors considered in the aggregate.")

### III.  <u>CONCLUSION</u>

Having carefully considered Defendants' arguments, the applicable law, and the entire record, the Court has determined that Defendants' post-trial motions discussed herein are without merit. No Defendant has successfully demonstrated that there is insufficient evidence to uphold his convictions, nor has any Defendant provided evidence that prejudicial errors occurred requiring a new trial. Therefore, for the reasons stated herein, Defendants' Motions for Acquittal or a New Trial are **denied.**

**IT IS SO ORDERED.**

_____
     Harry D. Leinenweber, Judge
     United States District Court

**DATE:** May 22, 2009

- 42 -